[No. E043786. Fourth Dist., Div. Two. Aug. 4, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS AVERY DALLAS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C. and III.

942

**COUNSEL**

Rex Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck, David Delgado-Rucci and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHLI, Acting P. J.**—Defendant Thomas Avery Dallas phoned his girlfriend while she was out and told her that her nine-month-old son had been hurt. The next day, the baby was found to have two skull fractures. (Fortunately, he recovered fully, with no permanent injuries.) Defendant claimed that the girlfriend's older son had hit the baby in the head with a plastic toy airplane; there was considerable evidence, however, that this was not true.

The trial court, citing Evidence Code section 1109, also admitted evidence that defendant had committed previous acts of domestic violence against a former girlfriend and previous acts of child abuse against that former girlfriend's child.

A jury found defendant guilty on two counts:

Count 1: Felony infliction of an injury on a child. (Pen. Code, § 273d, subd. (a).)

Count 2: Felony child abuse. (Pen. Code, § 273a, subd. (a).)

In connection with each count, it found true an enhancement for personally inflicting great bodily injury on a child under the age of five. (Pen. Code, § 12022.7, subd. (d).) Defendant was sentenced to a total of 12 years in prison.

■ In the published portion of this opinion, we will hold that, because defendant lived with the baby, this was not only a prosecution for "child

abuse" so that prior acts of child abuse were admissible under Evidence Code section 1109, subdivision (a)(3), but also a prosecution for "domestic violence" so that prior acts of domestic violence were likewise admissible under Evidence Code section 1109, subdivision (a)(1).

We will further hold that, because prior acts of child abuse were admissible in connection with count 1, the jury was also entitled to consider them in connection with count 2.

In the nonpublished portion of this opinion, we find no other prejudicial error. Hence, we will affirm.

I

FACTUAL BACKGROUND

A. *Evidence of the Charged Crimes.*

Defendant was living with his girlfriend Jessica (Jessie) P. and her three sons—seven-year-old S.P., four-year-old K.P., and the nine-month-old baby—at Jessie's home in Temecula.

Around July 2005, the baby started to seem "nervous" around defendant. For example, if Jessie walked into the room when defendant was holding him, he would turn and grab for her. In the morning, when he woke up, if defendant picked him up, "[h]e would scream as if he were being hurt."

On the night of August 5–6, 2005, Aimee Cunningham and her boyfriend Raymond Padilla visited defendant and Jessie. Defendant suggested going to the nearby Pechanga Casino. Around 11:30 p.m., however, because Cunningham and Padilla had been drinking, the couple went to sleep. Defendant then said that he could not go to the casino because he wanted to finish a video game and take a shower. Thus, around 1:00 a.m., Jessie went to the casino by herself.

Sometime during the night, when Padilla was half-awake, he heard somebody crying; he then went back to sleep.

Around 2:30 or 3:00 a.m., Jessie received "an emergency page." When she called home, defendant told her that the baby was hurt and that K.P. was also involved. He did not sound concerned.

When Jessie got home, K.P. was asleep. Defendant was holding the baby. The baby was not crying. When defendant handed the baby to Jessie, she

immediately noticed swelling on one side of his head. Defendant explained that he heard the baby crying; he went to the baby's room, where he found K.P. hitting the baby in the head with a plastic toy airplane. Defendant specifically said the baby was in his crib. He also said that he felt K.P. was sleepwalking.

Jessie said they should take the baby to a hospital. Defendant said that was not necessary and would only "get CPS on our ass." Jessie looked up head injuries in a baby-care book; it said to call a doctor if the baby showed "sleepiness, . . . bruising in and around the eyes and ears, [or] a soft spot on the head." The baby did not display any of these symptoms, so she did not insist on getting medical care for him.

The baby would not go back to sleep, so Jessie sat up with him. When she took him to his room, defendant followed her in. He seemed to scan the room; he then pointed to a child's "activity center table" and said that K.P. had been standing on it. Jessie thought it was odd that he had not mentioned the table before. It was standing upright where it normally stood, about 10 feet away from the crib. The legs of the table always left C-shaped impressions in the carpet. Jessie looked for these impressions near the crib but could not see any. Also, the airplane was normally kept in S.P.'s room, under his bed. In Jessie's opinion, it would have been impossible for K.P., while sleepwalking, to get the airplane out from under the bed, climb on the table, and hit the baby with it.

Jessie testified that, as far as she knew, K.P. did not sleepwalk. Also, she had never known him to be violent with his brothers or any other children. She admitted that, shortly after she separated from her husband, she found K.P. and another child tossing a kitten back and forth; the kitten had a bloody nose, but it survived. As a result, she placed K.P. in therapy. He seemed to respond well and had not shown any "inappropriately aggressive behavior" since then.

The next morning, defendant told Padilla that one of the children had hit the baby with a toy. He pointed to the living room floor.

Around noon, Jessie noticed that the baby's head felt "squishy" and that there were bruises in his ears. She took him to a medical center. X-rays taken there revealed that he had a skull fracture. As a result, he was taken to a hospital, where he was examined by Dr. Marilyn Kaufhold. Dr. Kaufhold is a forensic pediatrician and an expert on child abuse.

A CT scan showed that the baby had bilateral skull fractures—both parietal bones, on opposite sides of the head, were fractured. The fractures were

"long" and "went down the side of the head." The one on the right was "a little bit longer" than the one on the left. The scalp over both fractures was swollen, particularly on the right side, which was why the baby's head felt "squishy." The swelling meant that the fractures were "relatively fresh," as such swelling would go down "within several days to a couple [of] weeks."

The baby also had a number of bruises. First, he had a bluish bruise in the left ear, just outside the ear canal. He had another bluish bruise behind the right ear.[1] He had a yellowish-brown bruise above the right eye and a similar bruise right between the eyes.[2] He had several bruises on his back and side. He had a brownish bruise on his left arm. Finally, he had a brownish bruise on his right thigh. Dr. Kaufhold testified that, while "[i]t's not possible to date bruises very accurately," the bluish bruises to the ears were probably more recent than the others.

According to Dr. Kaufhold, a child of the baby's age can get a skull fracture several ways. The most common is in a fall; a fall of as little as a couple of feet, onto a hard surface, can produce a skull fracture. "[A]bout one percent of children who fall striking their head will get a skull fracture." The next most common way is in an automobile accident.

Bilateral skull fractures, however, "are much less common." They do not normally result from "a simple fall." Rather, they are associated with either a "high velocity impact[], such as in an auto accident or a fall from a greater height," or "a crush force, such as an automobile rollover [or] a head being caught in a vi[s]e of some kind . . . ." They could also result from two separate impacts.

Dr. Kaufhold had never heard of a four-year-old inflicting similar injuries on a baby. She found it "very improbable" that K.P. hit the baby with the airplane while sleepwalking, partly because it is "unusual" for a person to sleepwalk once and only once and partly because, even if K.P was standing on the activity table, he was not tall enough to reach into the crib and strike the baby with any force.

She admitted that the toy airplane was heavy enough to cause a skull fracture, if swung hard enough; in that event, however, she would have expected to see localized, depressed fractures, unlike the long, flat fractures

---

[1] This particular bruise could have been due to seepage from a skull fracture, rather than a "direct impact."

[2] Jessie told medical personnel, and later testified, that the baby had gotten these particular bruises by accident—one when he pulled down on an oven door, and the other when one of his brothers opened a door, unaware that he was on the other side.

the baby had. Also, it would be unlikely that this would cause bilateral fractures—"that you could do it twice and the other time be on the . . . other side of the head . . . ."

By the time of trial, the baby had recovered fully from his injuries, with no lasting impairments.

### B. *Evidence of Prior Acts of Child Abuse and Domestic Violence.*

#### 1. *Scalding J.S.'s Genitals.*

Crystal S. was defendant's former girlfriend; she had lived with him and was the mother of one of his children. J.S. was Crystal's son by a different father. When Crystal was living with defendant, J.S. was four years old.

J.S. testified that, on one occasion, when he was drawing a bath, defendant came into the bathroom, grabbed J.S.'s penis, pulled it under the hot running water and held it there. It felt "like it was bleeding." As a result, J.S.'s genitals were bruised for about a month.

Crystal testified that one day, when she was giving J.S. a bath, she discovered that "his balls were completely purple." She asked him what happened, but he would not talk to her about it at all. She then asked defendant what happened; he said his son had been wrestling with J.S. and had accidentally kneed him in the groin. The bruising started getting better after a week or so.

#### 2. *Suffocating J.S. with a Trash Bag.*

J.S. testified that, on another occasion, when his mother was out, defendant put a large plastic trash bag over his head and shoulders. Defendant then pushed his head against the seat of the couch. He could not breathe. He felt "[l]ike [he] was gonna die." Finally, defendant let him go.

Crystal testified that one day, she wanted to visit her grandfather in the hospital and to take J.S. with her. Defendant "threw a big fit," so she left J.S. with him and went alone. While she was out, she got a "really bad feeling in [her] gut" and phoned home. Defendant was "really upset." He said, "I found [J.S.] in the back yard, and he was in a trash bag, and his lips were blue." He added that he had performed mouth-to-mouth resuscitation, and J.S. was okay. Nevertheless, he insisted that she had to come home immediately.

When Crystal got home, J.S. would not say anything except that he was okay. When she asked him what had happened, defendant talked over him.

Defendant told her that J.S. had been trying to take a toy out of the bag when the bag "got stuck on him." He said that, when J.S. revived, J.S. asked, "Why are you kissing me[?]" Defendant "was focusing on that part, . . . trying to make it . . . a funny situation." When Crystal got angry, defendant said, "How can you doubt what I am saying to you, I saved your son's life, he'd be dead if it wasn't for me . . . ." She wanted to call an ambulance, but defendant said if she did, they would take J.S. away from her.

### 3. Holding J.S. Underwater.

Another time, J.S. was crawling between defendant's legs in a one-foot-high "kiddy pool" when defendant pinned his head between his legs and held him underwater. He could not breathe. After about 10 seconds, defendant let him go.

### 4. Choking J.S.

Another time, defendant gave J.S. a "timeout." When defendant said the timeout was over, he picked J.S. up by the neck and choked him. J.S. could not breathe. After finally letting him go, defendant "said it was a hug."

### 5. Breaking J.S.'s Arm.

Yet another time, J.S. testified, defendant was going to throw him onto a bed but threw him into the wall instead, breaking his arm.[3] He had to wear a cast.[4] Defendant said it was an accident, but J.S. did not believe him, because he never said he was sorry. Defendant told Crystal that a friend of his "was wrestling too rough with [J.S.] and accidentally hurt him."

### 6. Squeezing J.S.

Finally, J.S. testified, one time defendant was playing with him by throwing him onto a bed. On the second throw, however, defendant "squeezed [his legs and his body] together really hard," causing J.S. to throw up.

### 7. Domestic Violence Against Crystal.

At one point in their relationship, Crystal left defendant because "he was becoming more angry and more physical." After about a month, however, she went back to him. Things were better for about a month, but then defendant got "violent with [her] again."

---

[3] On cross-examination, however, J.S. testified he did not remember who broke his arm.

[4] Crystal testified that J.S. broke his clavicle, not his arm, and he wore a sling, not a cast.

There was one particular incident in which defendant became angry with Crystal; he was "screaming at [her] and throwing stuff." When she turned and walked away from him, he kicked her from behind, and she fell down. He held her down and yelled at her. When he left the room, she grabbed the phone and said she was calling the police. He came back in and "threw the phone out of [her] hand." He then got on top of her and pressed his forearm against her neck and her jaw with "all of his weight." She thought he was going to break her jaw. She was in "the worst pain [she had] ever felt."

Meanwhile, a neighbor had called the police. When they arrived, defendant ran out the back door. Crystal told the police what had happened. However, when the district attorney sought to prosecute defendant, Crystal admittedly did not cooperate. About a month after that, she left defendant and went to a domestic violence shelter.

When the incidents of child abuse happened, J.S. generally did not tell his mother about them, because he was afraid of defendant. After she left defendant, however, he did tell her about them.

C. *Defense Evidence.*

Cunningham had told the police that K.P. was a "troubled child," and she was afraid he would hurt her son. She had also told police that K.P. "was always poking at the baby," and she was afraid he might hurt him. At trial, she denied holding any of these opinions.

Jessie was originally introduced to defendant by their mutual friend, Nicole McGregor. Nicole testified that, when K.P. was three or four, he was "rough with other children," hitting, pushing, and throwing mud at them. He hit Nicole's son in the stomach, knocking him down, even though the other boy was two years older than he was. He also hit Nicole's daughter "a lot."

According to Nicole, K.P. would "go into [the baby's] room a lot and rip things out of his hands and push him back." Nicole once told Jessie that K.P. had an anger problem and probably needed help.[5] Jessie became angry and defensive.

Nicole's daughter, McKenze McGregor, who was 13 at the time of trial, testified that once, she was playing with the baby in his room when K.P. ran in, knocked the baby down, and said, "Those are my toys, leave them alone."

---

[5] Jessie denied this.

Another time, when the baby was sitting "propped up" on a chair in the kitchen, K.P. ran in, said, "That's my chair," pushed the baby off the chair, and sat in it himself.[6] The baby's head hit the floor.

McKenze confirmed that K.P. had once punched her brother, who was older than K.P. was, in the stomach. Another time, K.P. hit her sister, who was also older than he was. McKenze admitted, however, that she disliked Jessie "for what she's doing to [defendant]."

Jessie testified that she was no longer speaking to Nicole, because Nicole did not believe that defendant could have hurt the baby, and Nicole showed "no concern for the [baby's] well-being . . . ."

## II

## ISSUES RELATING TO EVIDENCE CODE SECTION 1109

Defendant raises several issues with respect to the trial court's admission of evidence under Evidence Code section 1109.

### A. *Additional Factual and Procedural Background.*

In the prosecution's trial brief, it noted that it intended to offer evidence of defendant's past acts of child abuse committed against J.S. It argued that this evidence was admissible on several alternative theories, including under Evidence Code section 1109.

The prosecution also noted that it intended to offer evidence of defendant's past acts of domestic violence committed against Crystal S. Its trial brief, however, did not specifically explain why this evidence was admissible.

Defense counsel objected to the evidence of child abuse as more prejudicial than probative under Evidence Code section 352. The trial court overruled the objection and admitted the evidence.[7]

Defense counsel also objected to the evidence of domestic violence, arguing that it was improper character evidence, that it was not similar to the current offenses because it was evidence of domestic violence rather than child abuse, and that it was unduly prejudicial. The prosecution argued that this evidence, too, was admissible under Evidence Code section 1109. The

---

[6] Jessie denied this. She added that the baby sat only in his highchair and was strapped in.

[7] It did exclude evidence of one prior instance of sexual, rather than physical, child abuse.

trial court ruled that evidence of multiple incidents involving domestic violence against Crystal would be cumulative; otherwise, however, it overruled the defense objections. Thus, it allowed the prosecution to introduce evidence of a single such incident.

Over defense counsel's objection, the trial court instructed the jury with CALJIC No. 2.50.02 (Evidence of Other Domestic Violence)[8] and CALJIC No. 2.50.04 (Evidence of Other Child Abuse Offenses).[9]

---

[8] CALJIC No. 2.50.02, as given in this case, stated: "Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence on one or more occasions other than that charged in the case.

" 'Domestic violence' means abuse committed against an adult or a fully emancipated minor, who is a spouse, former spouse, cohabitant, or former cohabitant or person with whom Defendant has had a child or is having or has had a dating or engagement relationship.

" 'Domestic violence' also means abuse committed against any of the following:

"A cohabitant or former cohabitant;

"A person with whom the defendant is having or has had a dating or engagement relationship;

"A child of the spouse, former spouse, person with whom the defendant has had a dating or engagement relationship, or a child of the male parent.

"A 'cohabitant' means a person who regularly resides in the household. A 'former cohabitant' means a person who formerly resided in the household.

" 'Cohabitant' means two unrelated adult persons living together for a substantial period of time resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, one, sexual relations between the parties while sharing the same living quarters, two, sharing of income or expenses, three, joint use or ownership of property, four, whether [the] parties hold themselves out as husband and wife, five, the continuity of the relationship, and six, the length of the relationship.

" 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself or another.

"*If you find that the defendant committed a prior offense in[volv]ing domestic violence, you may but are not required to infer that the defendant had a disposition to commit other offenses involving domestic violence. If you find that the defendant had this disposition, you may but are not required to infer he was likely to commit and did commit the crime of which he is accused.*

"However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence[,] in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

"Unless you are otherwise instructed, you must consider this evidence for no other purpose." (Italics added.)

[9] CALJIC No. 2.50.04, as given in this case, stated: "Evidence has been introduced for the purpose of showing that the defendant committed an offense of child abuse, namely, a violation of Penal Code section 273d, on one or more occasions other than that charged in this case.

### B. *Statutory Background.*

Evidence Code section 1109, subdivision (a)(1), as it stood on August 6, 2005, the date of the offenses, and as it stands now, provides: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Effective January 1, 2006, the Legislature added subdivision (a)(3) to Evidence Code section 1109, which provides: "[I]n a criminal action in which the defendant is accused of an offense involving child abuse, evidence of the defendant's commission of child abuse is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Stats. 2005, ch. 464, § 1.) It also added subdivision (d)(2), which provides: "As used in this section: [¶] . . . [¶] . . . '[c]hild abuse' means an act proscribed by Section 273d of the Penal Code." (Stats. 2005, ch. 464, § 1.)

### C. *Ex Post Facto Application.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. *Prior Acts of Domestic Violence.*

Defendant contends that the trial court erred by admitting evidence of prior acts of domestic violence under Evidence Code section 1109.

---

*"If you find that the defendant committed a prior violation of Penal Code Section 273d, you may but are not required to infer that the defendant had a disposition to commit the offenses involving child abuse. If you find that the defendant had this disposition, you may but are not required to infer that he was likely to commit and did commit the crimes with which he is accused.*

"However, if you find by a preponderance of the evidence that the defendant committed the prior offenses of child abuse, this finding is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. . . .

"If you determine an inference properly can be drawn from this evidence, this inference is one item for you to consider along with all other evidence in determining whether the defendant has been proved guilty beyond a reasonable doubt of the crime charged.

"Unless you are otherwise instructed, you must not consider this evidence for any other purpose." (Italics added.)

*See footnote, *ante*, page 940.

■ As already noted, Evidence Code section 1109, subdivision (a)(1) provides for the admission of acts of "domestic violence" in a prosecution for "an offense involving domestic violence." Evidence Code section 1109, subdivision (a)(3) then provides for the admission of acts of "child abuse" in a prosecution for "an offense involving child abuse." However, Evidence Code section 1109 does not explicitly provide for the admission of acts of domestic violence in a prosecution for an offense involving child abuse, nor vice versa.

Defendant argues that he was charged only with child abuse, not domestic violence, and therefore evidence of acts of domestic violence was not admissible under Evidence Code section 1109. The People respond that, because the purpose of Evidence Code section 1109 is to admit propensity evidence, and because "[t]he propensity to commit violence, whether on a partner, or upon a child, is the same," evidence of acts of either type of abuse should be admissible in a prosecution for the other. They do not explain, however, how Evidence Code section 1109 can be read to bring about this result.

Evidence Code section 1109 provides: " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).)

Taking Penal Code section 13700 first, it defines domestic violence as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b).)

For purposes of Penal Code section 273.5, which defines the crime of inflicting corporal injury on a cohabitant, "cohabitants" have been defined as "those ' "living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." ' [Citation.]"

(*People v. Taylor* (2004) 118 Cal.App.4th 11, 18 [12 Cal.Rptr.3d 693], quoting *People v. Moore* (1996) 44 Cal.App.4th 1323, 1333 [52 Cal.Rptr.2d 256], quoting *People v. Holifield* (1988) 205 Cal.App.3d 993, 1000 [252 Cal.Rptr. 729].) We may assume, without deciding, that "cohabitant" has the same meaning in Penal Code section 13700. If so, then the baby was not defendant's "cohabitant," and therefore defendant was not charged with an offense involving "domestic violence" under this definition.

█ Family Code section 6211, however, defines domestic violence more broadly as including abuse committed against either "[a] cohabitant or former cohabitant, as defined in Section 6209" (Fam. Code, § 6211, subd. (b)), or "[a] child of a party" (Fam. Code, § 6211, subd. (e)). Once again, we may assume, without deciding, that because the baby was not defendant's own child, he was not the child of a party. This time, however, we cannot just assume that "cohabitant" has the definition established in case law. Rather, Family Code section 6211 expressly incorporates the following definition in Family Code section 6209: " 'Cohabitant' means a person who regularly resides in the household." (See also *Dunn v. Superior Court* (1993) 21 Cal.App.4th 721, 727 [26 Cal.Rptr.2d 365] ["the Legislature has used the term differently in various contexts, sometimes to connote living together as husband and wife, and sometimes to connote simply living together"]; *People v. Siravo* (1993) 17 Cal.App.4th 555, 561 [21 Cal.Rptr.2d 350] [" ' "[c]ohabitation means simply to live or dwell together in the same habitation; evidence of lack of sexual relations is irrelevant" ' "].) The baby regularly resided in defendant's household. Accordingly, in this action, defendant was charged with an offense involving "domestic violence" within the meaning of Family Code section 6211.

Defendant points out, however, that Evidence Code section 1109 incorporates the definition in Family Code section 6211 subject to two qualifications—(1) "if the act occurred no more than five years before the charged offense," (2) and "[s]ubject to a hearing conducted pursuant to Section 352 . . . ." (Evid. Code, § 1109, subd. (d)(3).) These qualifications seem designed to apply to the type of *evidence* that is made admissible ("evidence of the defendant's commission of other domestic violence"), but not to the type of *prosecution* in which it is made admissible ("a criminal action in which the defendant is accused of an offense involving domestic violence"). (*Id.,* subd. (a)(1).) Defendant concludes that the Legislature must have intended the definition to apply to the former, but not to the latter.

We disagree. First of all, it would be somewhat bizarre for "domestic violence" to mean something different from "*other* domestic violence," particularly when used in the same sentence. Moreover, precisely *because* the two qualifications are designed to apply to the type of evidence, they do not meaningfully limit the type of prosecution. By definition, the charged offense cannot have occurred "more than five years before the charged offense"; accordingly, this criterion will always be satisfied. Similarly, the prosecution's discretion to charge a defendant with an offense involving domestic violence is not "[s]ubject to . . . [Evidence Code] Section 352"; accordingly, making the definition subject to Evidence Code section 352 has no effect.

This conclusion finds support in the legislative history. Evidence Code section 1109, as originally enacted in 1996, merely provided: "As used in this section, 'domestic violence' has the meaning set forth in Section 13700 of the Penal Code." (Evid. Code, former § 1109, subd. (d); Stats. 1996, ch. 261, § 2, pp. 1795, 1796.) In 2004, Assemblymember Cohn introduced Assembly Bill No. 141. The Assembly initially passed a version of this bill that simply provided: "As used in this section, 'domestic violence' has the meaning set forth in *Section 6211 of the Family Code or* Section 13700 of the Penal Code." (Assem. Amend. to Assem. Bill No. 141 (2003–2004 Reg. Sess.) Apr. 23, 2003.)[10]

A committee analysis explained that the preexisting version of Evidence Code section 1109 used "the definition of domestic violence in Penal Code section 13700 . . . . This definition includes only violence against a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship. AB 141 would instead amend the exception to include domestic violence as defined in Family Code section 6211, which includes violence against any child of a party. The bill will facilitate the prosecution of domestic violence by allowing in propensity evidence *in the prosecution of cases of domestic violence against children,* and by allowing evidence of a defendant's prior commission of domestic violence against a child to be used in appropriate domestic violence prosecutions." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 141 (2003–2004 Reg. Sess.) as amended Apr. 23, 2003, pp. 1–2, italics added.)[11]

---

[10] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_bill_20030423_amended_asm.html> (as of Aug. 8, 2008).

[11] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_cfa_20030508_104335_asm_comm.html> (as of Aug. 8, 2008).

In a Senate committee vote, however, the bill failed to pass. (Assem. Bill No. 141 (2003–2004 Reg. Sess.) Complete Bill History.)[12] The author therefore amended it so as to provide: "As used in this section, 'domestic violence' has the meaning set forth in . . . Section 13700 of the Penal Code. *Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code.*" (Sen. Amend. to Assem. Bill No. 141 (2003–2004 Reg. Sess.) May 13, 2004.)[13]

The Senate committee amended it further so as to provide: "As used in this section, 'domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code *if the act occurred no more than five years before the charged offense.*" (Sen. Amend. to Assem. Bill No. 141 (2003–2004 Reg. Sess.) June 9, 2004.)[14]

A subsequent third reading analysis demonstrates that the only intent behind the amendments was "to make the bill's proposed expansion of the definition of 'domestic violence' *for purposes of propensity evidence . . .* expressly subject to a section 352 hearing, which would be required to include corroboration and remoteness in time . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 141 (2003–2004 Reg. Sess.) as amended June 9, 2004, p. 2, italics added.)[15] However, there is no indication that the amendments were intended to narrow the proposed expansion of the class of cases in which such evidence would be admissible. To the contrary, the analysis stated that intent behind the bill as a whole was still to *change* "current law, [under which] propensity evidence is admissible during sexual assault, elder or dependant adult and domestic violence prosecutions, *but not as to child abuse.*" (*Id.* at p. 3, italics added.)

---

[12] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_bill_20040706_history.html> (as of Aug. 8, 2008).

[13] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_bill_20040513_amended_sen.html> (as of Aug. 8, 2008).

[14] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_bill_20040609_amended_sen.html> (as of Aug. 8, 2008).

[15] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_cfa_20040609_135509_sen_floor.html> (as of Aug. 8, 2008).

Similarly, a subsequent Assembly analysis stated that using the "broader definition" of domestic violence in Family Code section 6211 "will have two effects. First, and most important, *prosecutors will be able to use propensity evidence in the prosecution of child abuse cases.* . . . Second, in any domestic violence case, the prosecutor will be able to bring in relevant evidence of prior violence against children." (Concurrence in Sen. Amends., Assem. Bill No. 141 (2003–2004 Reg. Sess.) as amended June 9, 2004, p. 4, italics added.)[16] We therefore conclude that, under Evidence Code section 1109, subdivision (d)(3), the definition of domestic violence in Family Code section 6211 can apply not only to the type of evidence admissible under Evidence Code section 1109, subdivision (a)(1), but also to the type of prosecution in which such evidence is admissible.

Defendant relies on subsequent legislative history regarding Assembly Bill No. 114 (2005–2006 Reg. Sess.), which added subdivision (a)(3) to Evidence Code section 1109. As he points out, the author of this bill originally proposed to make acts of domestic violence cross-admissible in a prosecution for child abuse. (Assem. Bill No. 114 (2005–2006 Reg. Sess.) as introduced Jan. 12, 2005.)[17] Before the bill was passed, however, this provision was eliminated. (See Sen. Amend. to Assem. Bill No. 114 (2005–2006 Reg. Sess.) June 27, 2005.)[18] Defendant concludes that the Legislature intended that evidence of domestic violence *not* be cross-admissible in child abuse cases.

It is by no means clear that this is why the Legislature eliminated the provision for cross-admissibility. An earlier analysis of the bill had asked: "Is This Bill Necessary? Inasmuch as children are specified victims of domestic violence under the Family Code and since [Evidence] Code Section 1109 already provides that evidence of a defendant's commission of other domestic violence is not made inadmissible in a prosecution for domestic violence subject to an evidentiary determination by the court pursuant to Evidence Code Section 352, supra, is this bill necessary?" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 114 (2005–2006 Reg. Sess.) as amended Mar. 8, 2005, pp. 5–6.)[19] Thus, the Legislature may have eliminated the

---

[16] Available at <http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0101-0150/ab_141_cfa_20040616_165158_asm_floor.html> (as of Aug. 8, 2008).

[17] Available at <http://www.leginfo.ca.gov/pub/05-06/bill/asm/ab_0101-0150/ab_114_bill_20050112_introduced.html> (as of Aug. 8, 2008).

[18] Available at <http://www.leginfo.ca.gov/pub/05-06/bill/asm/ab_0101-0150/ab_114_bill_20050627_amended_sen.html> (as of Aug. 8, 2008).

[19] Available at <http://www.leginfo.ca.gov/pub/05-06/bill/asm/ab_0101-0150/ab_114_cfa_20050314_100952_asm_comm.html> (as of Aug. 8, 2008).

cross-admissibility provision precisely because it agreed with our conclusion—that a prosecution for abuse of a child living in the defendant's household is "a criminal action in which the defendant is accused of an offense involving domestic violence" within the meaning of Evidence Code section 1109, subdivision (a)(1). (Cf. *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1184 [7 Cal.Rptr.3d 552, 80 P.3d 656] ["the failure of the Legislature to adopt [the] proposed amendments . . . could merely reflect a determination that such amendments were unnecessary because the law already so provided"].)

█ In any event, " '[w]e can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law.' [Citation.]" (*People v. Mendoza* (2000) 23 Cal.4th 896, 921–922 [98 Cal.Rptr.2d 431, 4 P.3d 265], fn. omitted, quoting *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1349 [241 Cal.Rptr. 42, 743 P.2d 1299].) "[W]hen the Legislature amends a bill to add a provision, and then deletes that provision in a subsequent version of the bill, this failure to enact the provision is of little assistance in determining the intent of the Legislature. [Citations.]" (*American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1261–1262 [23 Cal.Rptr.3d 453, 104 P.3d 813].)

We therefore conclude that the trial court did not err by admitting the evidence of prior acts of domestic violence.

E. *Admissibility of Prior Acts of Child Abuse in Connection with Count 2.*

Finally, defendant contends that, even assuming the prior acts of child abuse were properly admitted in connection with count 1, the trial court erred by allowing the jury to consider them in connection with count 2.

█ Evidence Code section 1109, subdivision (a)(3), by its terms, applies "in a criminal action in which the defendant is accused of an offense involving child abuse . . . ." "Child abuse," in this context, is defined as "an act proscribed by Section 273d of the Penal Code." (Evid. Code, § 1109, subd. (d)(2).)[20] In count 1, defendant was charged with violating Penal Code

---

[20] Defendant has never contended that any of the acts he was shown to have committed against J.S. did not qualify as child abuse within the meaning of Evidence Code section 1109, subdivision (a)(3). Any such contention has been forfeited.

section 273d. In count 2, however, he was charged with violating Penal Code section 273a. Defendant therefore argues that the jury should not have been allowed to consider evidence of his prior acts of child abuse in connection with count 2.

This is an issue, first and foremost, of statutory interpretation. In Evidence Code section 1109, the Legislature specifically referred to "a criminal *action*." (Italics added.) An "action" embraces all of the counts (and other allegations) charged. If the Legislature had wanted to make the evidence admissible only in connection with a particular count, it could have said so. In fact, it said just the opposite.

There is an obvious practical problem with asking a jury to limit its consideration of certain evidence to just one of several counts in an action. Ordinarily, we presume that jurors can follow an instruction to do so; however, there are times when the evidence is so potent or inflammatory that this presumption is overcome. The Legislature could reasonably choose to obviate the issue by providing that, whenever the evidence is admissible in connection with one count, it is admissible in connection with all counts, subject only to Evidence Code section 352. If the evidence is logically *relevant* to only one count, the defendant would be entitled to an instruction to that effect, on request. (Evid. Code, § 355.) Here, however, the evidence was logically relevant to both counts.

We therefore conclude that the trial court properly allowed the jury to consider evidence of defendant's prior acts of child abuse in connection with count 2 as well as count 1.

### III

### SUFFICIENCY OF THE EVIDENCE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 940.

## IV

## DISPOSITION

The judgment is affirmed.

Gaut, J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 22, 2008, S166744. Werdegar, J., did not participate therein.