Filed 3/23/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071660 |
| v. | (Super.Ct.No. RIF1605470) |
| GLORIA DIANE MITCHELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Jorge C. Hernandez, Judge. Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.C and III.D.

1

# I. INTRODUCTION

Defendant and appellant Gloria Mitchell was convicted by a jury of several offenses involving three minor victims, John Doe 1, John Doe 2 and Jane Doe. With respect to John Doe 1, defendant was convicted of torture (count 1, Pen. Code,[1] § 206) and mayhem (count 2, § 203[2]). With respect to John Doe 2 and Jane Doe, defendant was convicted of misdemeanor child abuse (counts 4 & 5, § 273a, subd. (b))[3].

Defendant was sentenced to a term in state prison of seven years to life on count 1; the middle term of four years on count 2; 180 days in county jail on count 4; and another 180 days in county jail on count 5. However, the trial court stayed the sentence on count 2 pursuant to Penal Code section 654 and deemed the sentence on counts 4 and 5 satisfied based on credit for time already in custody. The trial court also imposed a restitution fine in the amount of $300 (Pen. Code, § 1202.4, subd. (b)); a court operation assessment in the amount of $160 (Pen. Code, § 1465.8, subd. (a)(1)); and a criminal conviction assessment in the amount of $120 (Gov. Code, § 70373).[4]

---

[1] Unless otherwise noted, all undesignated statutory references are to the Penal Code.

[2] Defendant was charged with aggravated mayhem (§ 205), but convicted of the lesser included offense of simple mayhem (§ 203).

[3] In each count, defendant was charged with child abuse likely to cause great bodily injury or death (§ 273a, subd. (a)), but convicted of the lesser included offense of misdemeanor child abuse (§ 273a, subd. (b)).

[4] The trial court also imposed a parole revocation fine in the amount of $300 pursuant to Penal Code section 1202.45, subdivision (c), but suspended the fine unless parole is revoked.

Defendant appeals arguing that (1) the trial court erred in admitting a recorded interview with each minor victim pursuant to Evidence Code section 1360; (2) the trial court erred in admitting testimony disclosing hearsay statements made by John Doe 1 to a doctor pursuant to Evidence Code section 1253; (3) the cumulative error of admitting hearsay statements was sufficiently prejudicial to warrant reversal of her conviction on counts 1 and 2; and (4) we should strike the fines and fees imposed by the trial court as unconstitutional under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  We find no error in the trial court's application of Evidence Code sections 1360 and 1253 to admit evidence of prior hearsay statements by minor victims and therefore no individual or cumulative error warranting reversal.  We further find that defendant has failed to show error or prejudice in the imposition of any fines or fees.  Accordingly, we affirm the judgment.

II. FACTS AND PROCEDURAL HISTORY

*A. Facts and Charges*

In 2015, defendant took custody of three of her sister's children, John Doe 1, John Doe 2, and Jane Doe, to prevent their placement in foster care.  On the afternoon of September 19, 2016, John Doe 1 was admitted to the hospital with severe injuries to his genital area.  John Doe 1's penis had been "degloved"[5] and a 12-centimeter long, two-

---

[5] The treating physician described "degloving" as like skinning the body part and specifically noted that with John Doe 1, it was possible to simply lift the loose skin, open it like a book and view the erectile chambers of his penis, spermatic cord, and blood vessels.

*[footnote continued on next page]*

inch deep laceration appeared on the left side of his scrotum. The wounds required two layers of sutures to close.[6] The treating physicians did not believe such an injury could have been sustained on a playground without significant incident, significant bleeding at the scene, and tearing of John Doe 1's outer clothing. They referred John Doe 1's case to a social worker during his hospitalization.[7]

During the subsequent investigation of John Doe 1's injury, defendant told authorities that John Doe 1 sustained his injury while at school. However, John Doe 1's teachers reported observing symptoms of injury at the very outset of the school day and there were no reported incidents of a fall during John Doe 1's recess time on the date of his hospitalization. During the investigation of the case, John Doe 2 and Jane Doe also appeared to have visible signs of nonaccidental physical injury. Eventually all three children were brought to the Riverside County Child Assessment Center for examination of their injuries and interviews to be conducted by the Riverside County Child Assessment Team (RCCAT).

In his recorded RCCAT interview, John Doe 1 told investigators that defendant hit him with a white cord. He stated that she used the white cord to pull his "owie," which caused him to cry. He further stated she used the cord to hit him on his back. He had to be taken to the hospital as a result of "the hurting" between his legs caused by defendant.

---

[6] A doctor also opined that the wound will require future surgical intervention.

[7] Child protective services also received an independent report from John Doe 1's school regarding suspected abuse based upon teacher observations of John Doe 1's behavior at school on September 19, 2016.

4

He also claimed defendant injured him with a tool that he described as something that "closed" and "opened"; was kept in a drawer; and used on green trees. It caused him to cry a lot and bleed in his underwear. Defendant told him not to tell anyone about the incident. He was afraid defendant would "whoop" him again if he told anyone.

In his separate RCCAT interview, John Doe 2 told investigators that John Doe 1 injured himself by falling at school. When John Doe 1 fell, his "area" got caught and ripped open, but John Doe 1 was not in pain and did not cry out. He did not witness the incident himself, but stated his sister did and told him about it. On further questioning, John Doe 2 recalled incidents in which John Doe 1 got into trouble and as a result defendant pulled on John Doe 1's "weenie wee." He never saw defendant actually pull John Doe 1's "weenie wee," but would hear screaming and John Doe 1 would return to their room and tell both he and his sister about it afterward. On one occasion, he saw the injury to John Doe 1 following one of these incidents. He described the injury to John Doe 1 as "very bad"; "so bloody"; "the blood went on always—all over his underwear"; "it was all blood"; "it was ripped and his guts was . . . intestines, guts . . . was inside out."

John Doe 2 also reported defendant would discipline him with a belt, switch, or back scratcher, although usually defendant would just ground him. Sometimes the whooping would be so hard that it would leave marks and bruises on John Doe 2. He showed the interviewer a mark still on his legs that he claimed resulted from being hit with a switch. Defendant would also discipline him with an extension cord. When asked about a noticeable burn scar on his left leg, John Doe 2 claimed he got the burn from playing with the stove. He set a plastic bowl on fire and then accidentally placed it in his

5

lap.  When asked why the burn marks appeared to show multiple lines instead of a circle shape like a bowl, John Doe 2 acknowledged that it "should've burned like a round" mark, but could not explain the lines.

In her interview, Jane Doe told investigators that John Doe 1 got hurt when he was playing at school and his shorts got caught on something, which caused "it" to "split it all open, and stuff."  She stated John Doe 1 tripped and got caught on something, which sliced through him.  She claimed to have witnessed the incident and that John Doe 1 did not cry.  She stated that as a result, John Doe 1 was limping the entire day at school.  She stated that when John Doe 1 was disciplined by defendant, it was defendant's business and she "can't tell her business."  She acknowledged defendant would hit her with a back scratcher as discipline.  On some occasions, defendant would discipline her as well as John Doe 2 by hitting them with an extension cord.  Defendant hit her so hard that it left permanent marks on her legs.  However, she stated John Doe 1 never got hit with the extension cord.  When asked if she knew about John Doe 2's burn injury, she recalled a specific incident in which John Doe 2 was playing with the stove and placed a hot plastic bowl into his lap causing burns.  She also noted that John Doe 2 liked to play with fire and recounted several incidents where he hurt himself by playing with the stove or hot liquid.

On March 8, 2017, the People filed an information that charged defendant with one count of torture on John Doe 1 (count 1, § 206); one count of aggravated mayhem on John Doe 1 (count 2, § 205); one count of torture with resulting great bodily harm to John Doe 1 (count 3, §§ 206, 12022.7, subd. (a)); one count of child abuse likely to cause great

6

bodily injury or death on Jane Doe (count 4, § 273a, subd. (a)); and one count of child abuse likely to cause great bodily injury or death on John Doe 2 (count 5, § 273a, subd. (a)).

*B. Relevant Evidence at Trial*

    1.  <u>Admission of RCCAT Interviews</u>

Over defendant's objection, the trial court admitted each child's RCCAT interview pursuant to Evidence Code section 1360. However, to ensure the admission of such evidence complied with the procedural protections set forth in that statute, the parties stipulated to a procedure where the transcripts of each interview were produced to the trial court in advance and the recorded interviews would not be played to the jury until after the children completed their live testimony before the jury.

    2.  <u>Testimony of John Doe 1 at Trial</u>

John Doe 1 was eight years old at the time of trial. He referred to his groin area as his "par par" or "nee nee" and testified that defendant hit his "par par" on multiple occasions when he used to live with her. When asked to describe the manner in which defendant hit him, he made a fist and squeezing motion with his hands. He reported that defendant hit him approximately 10 times in this manner. He reported that on some occasions she would hit him to the point blood would come out. He testified that his hospitalization was the result of an injury inflicted by defendant. However, he provided inconsistent testimony when asked whether defendant ever hit him with any objects other than her hands, first denying any such incidents, but later stating that he could not

7

remember. He denied defendant ever hit him with a cord, but also stated that he witnessed defendant hit Jane Doe and John Doe 2 with a cord.

### 3. Testimony of John Doe 2 at Trial

John Doe 2 was 10 years old at the time of trial. He lived with defendant at the same time as John Doe 1 and Jane Doe. He did not like living with defendant, in part because she hurt John Doe 1's private parts. He recalled an incident in defendant's home where he heard John Doe 1 scream loudly from another room. When John Doe 1 returned to their shared room, John Doe 1 was crying and told John Doe 2 that defendant pulled on his private part area. John Doe 2 saw that John Doe 1 was bleeding from his private area. However, he and Jane Doe initially told people that John Doe 1 got injured on the playground at school because he feared defendant would hit them if they told the truth. He was afraid defendant would hit him if he did not lie about John Doe 1's injuries.

John Doe 2 also testified defendant would discipline him by hitting him with a wooden back scratcher, a switch, and an electrical cord. The hits with the cord sometimes left marks on his body. Contrary to his RCCAT statement, he now claimed the burns on his left leg occurred when defendant became angry with him and burned him with an iron. When asked why he previously denied defendant hit him, he explained that he was afraid defendant would hit him again in the future.

### 4. Testimony of Jane Doe at Trial

Jane Doe was 11 years old at the time of trial. She used to live with defendant, but does not like speaking about what happened during that time because it makes her feel

8

bad and sad. She initially testified defendant never hurt her, but later admitted defendant would hit both she and John Doe 2 with a back scratcher as discipline. She testified that defendant would pull John Doe 1's private part every time he got in trouble. She knew because each time, she would hear John Doe 1 yell, scream, and return to their shared room with his underwear bloody. She recalls that on one occasion after such an incident, John Doe 1 showed her his penis and she saw marks on it. She admitted she lied to people about John Doe 1's injury being caused by an accident on the playground because she thought she would get in serious trouble with defendant if she told the truth. On cross-examination, she admitted she never saw defendant actually pull John Doe 1's penis. She further admitted that she previously told multiple people that John Doe 1's injury was caused by an accident on the school playground. She continued to assert that John Doe 2 burned himself on the leg by setting something on fire in a bowl.

5. Testimony of Forensic Pediatrician at Trial

A forensic pediatrician was also called to testify. She works with assisting in investigating cases of suspected child abuse and estimated she has testified in over 100 cases. She was called to the hospital to evaluate suspected abuse and first encountered John Doe 1 while he was a patient at the hospital recovering from the injury to his genital area. Over the course of John Doe 1's hospital recovery, she would encounter him as she made rounds with other patients and John Doe 1 developed a familiarity with her.

More than a week after his discharge from the hospital, John Doe 1 was brought to the Children's Assessment Center for his RCCAT examination and interview. The forensic pediatrician happened to be working with a colleague in her office at the center

9

during that time. John Doe 1 saw her through her open office door, recognized her, ran over to say hi, and initiated general conversation with her. After some time, it appeared that John Doe 1 was lingering in her office, so she mentioned that she knew he was at the center for the purpose of undergoing an interview. In response, she observed John Doe 1's demeanor change and he volunteered that "his auntie did it." He then picked up the forensic accountant's phone charging cord and demonstrated the manner in which defendant used a cord to hurt him. She did not ask any questions in response and just let John Doe 1 continue talking voluntarily. John Doe 1 proceeded to explain and demonstrate that defendant would wrap a cord around his genital area and pull, causing him to cry. He went on to explain and demonstrate that defendant would take some unspecified tool used to cut things and open and close it around his genital area, causing a lot of bleeding. When the pediatrician stated that she didn't understand what tool he was referring to, John Doe 1 pointed out the window and stated it was something used on green trees. When John Doe 1 finished, the pediatrician did not ask follow up questions to get details, but instead went and informed the assigned interviewer of the disclosures.

*C. Verdict and Sentencing*

The jury returned a verdict finding defendant guilty of torture regarding John Doe 1 on count 1; guilty of the lesser included offense of simple mayhem regarding John Doe 1 on count 2; not guilty of torture with resulting great bodily injury on count 3; guilty of the lesser included offense of misdemeanor child abuse of Jane Doe on count 4; and guilty of the lesser included offense of misdemeanor child abuse of John Doe 2 on count 5. Defendant was sentenced to a term in state prison of seven years to life on count

10

1; the middle term of four years on count 2; 180 days in county jail on count 4; and another 180 days in county jail on count 5. The trial court stayed the sentence on count 2 pursuant to section 654 and deemed the sentence on counts 4 and 5 served based upon credit for time already in custody.

The trial court also imposed a restitution fine in the amount of $300 (Pen. Code, § 1202.4, subd. (b)); a court operation assessment in the amount of $160 (Pen. Code, § 1465.8, subd. (a)(1)); and a criminal conviction assessment in the amount of $120 (Gov. Code, § 70373).

## III. DISCUSSION

### A. *Admission of RCCAT Statements Were Not Erroneous*

Defendant contends the trial court erred in admitting the RCCAT interviews given by each child pursuant to Evidence Code section 1360. Specifically, defendant argues that Evidence Code section 1360 can only be used to admit evidence when one of the offenses enumerated in subdivision (c) of that section is charged. We disagree.

#### 1. *General Legal Principles and Standard of Review*

"Section 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse. [Citations.]" (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.) The statute includes a number of procedural and substantive safeguards designed to ensure the reliability of the minor victim's hearsay statement, requiring specific conditions be met before evidence can be admitted under its provisions.

11

(*Ibid.*; Evid. Code, § 1360, subd. (a).) Normally, "[w]e review a trial court's admission of evidence under section 1360 for abuse of discretion." (*Roberto V.*, at p. 1367.)

However, defendant's challenge here is not premised upon the trial court's application of the procedural or substantive safeguards provided in the statute as a condition of admissibility. Instead, defendant argues that the statute on its face cannot be applied in cases where the criminal defendant is not charged with one of the offenses enumerated in subdivision (c) of Evidence Code section 1360. This presents solely a question of statutory interpretation.

"[I]n reviewing a trial court's interpretation of a statute, we apply a de novo, or independent, standard of review. . . . [O]ur task is to ascertain and effectuate the law's intended purpose. . . . [W]e look first to the statute's words. [Citation.] . . . If the statutory language is unambiguous, we will presume the Legislature meant what it said and the plain meaning of the statute will prevail unless its literal meaning would result in absurd consequences that the Legislature did not intend. [Citations.] [¶] However, if the statutory language is ambiguous and is reasonably susceptible to more than one meaning, we look to a variety of extrinsic aids, . . . Our ultimate objective in interpreting a statute is to construe the statute in a way that most closely comports with the apparent intent of the Legislature. [Citation.]" (*People v. LaDuke* (2018) 30 Cal.App.5th 95, 100.) Here, defendant takes the position that extrinsic aids are not necessary because the statute is not ambiguous and the Legislature's intent can be ascertained solely from the words of Evidence Code section 1360. We therefore look to the words of the statute to evaluate the merits of defendant's interpretation.

12

*2. The Language of Evidence Code Section 1360 Does Not Limit Its Application Based Upon the Specific Offenses Charged*

The provisions setting forth the scope of Evidence Code section 1360's application can be found in subdivision (a) of that section, which provides, in part: "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another . . . is not made inadmissible by the hearsay rule. . . ." (Evid. Code, § 1360, subd. (a).) The plain language of this subdivision sets forth several limitations on the application of Evidence Code section 1360. The first limitation is based upon character of the proceeding at issue (the proceeding must be a "criminal prosecution where the victim is a minor"); the second is based upon the character of the witness making the statement (the statement must be "made by the victim when under the age of 12"); and the third is based upon the character of the statement itself (the statement must describe "any act of child abuse or neglect performed with or on the child by another"). Thus, the only limitation in Evidence Code section 1360 that involves the character of the proceeding at issue is the limitation requiring the proceeding be a criminal prosecution in which the victim is a minor. No language indicates a limitation based upon the specific offenses charged.

Defendant argues that because subdivision (c) of Evidence Code section 1360 references specific provisions of the *Penal Code*, this language shows a clear intent by the Legislature to limit the application of the statute to cases in which these enumerated offenses are charged. However, by its very terms, Evidence Code section 1360,

13

subdivision (c), is intended to define the terms "child abuse" and "child neglect" as used in the statute. As already set forth *ante*, the terms "child abuse" and "child neglect" are used to describe the substantive nature of the statements admissible under the statute. No language in the statute requires that any specific charges be filed in order for it to apply. The statute applies when the statement describes an act of child abuse as defined by specified Penal Code sections.[8] In this case, the statements unquestionably describe such acts.

Our interpretation of Evidence Code section 1360 is supported by the fact that in other provisions of the *Evidence Code*, the Legislature has specifically referenced the charged conduct as the basis for limiting the application of an evidentiary exception. (See Evid. Code, § 1350, subd. (a) [providing a hearsay exception "[i]n a criminal proceeding charging a serious felony"]; Evid. Code, § 1380, subd. (a) [providing hearsay exception "[i]n a criminal proceeding charging a violation . . . of Section 368 of the Penal Code"].)[9] Thus, had the Legislature intended to limit the application of Evidence Code section 1360 based upon the nature of the charges made against a criminal defendant, it certainly could have done so and knew the specific language to use in order to do so.

---

[8] The definition of "child abuse" in Evidence Code section 1360 includes any act proscribed by Penal Code section 273d. (Evid. Code, § 1360, subd. (c).) In turn, Penal Code section 273d prohibits the willful infliction upon a child of any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition. (Pen. Code, § 273d, subd. (a).)

[9] Section 1380 was subsequently held unconstitutional on grounds not relevant to this opinion in *People v. Pirwani* (2004) 119 Cal.App.4th 770.

14

Finally, we avoid interpreting statutes in a manner that may produce illogical results. Under defendant's proposed interpretation of the statute, a minor victim's hearsay statement would be admissible in cases in which the defendant is only charged with a misdemeanor pursuant to Penal Code section 273a, but inadmissible where the defendant's conduct is more severe, warranting more serious charges. We note that in interpreting analogous Evidence Code provisions pertaining to domestic violence offenses, the courts have specifically rejected interpretations that would produce this type of limitation. For example, Evidence Code section 1109, subdivision (a)(1), provides a statutory exception allowing admission of evidence of a defendant's prior acts of domestic violence "in a criminal action in which the defendant is accused of an offense involving domestic violence." In interpreting this statute, courts have unambiguously rejected the suggestion that it may only be applied when a domestic violence offense is charged, noting that such an interpretation would produce an absurd result in cases where a defendant's underlying conduct would qualify for a domestic violence offense, but also a more serious offense. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1234-1237 [statute applied despite the fact defendant was charged and prosecuted for murder]; *People v. Dallas* (2008) 165 Cal.App.4th 940, 951-957 [statute applied despite the fact defendant was charged with violation of child abuse statutes and not domestic violence statutes].)

Defendant's proposed interpretation of Evidence Code section 1360 would produce the same incongruous result here. In this case, while defendant was formally charged with torture and aggravated mayhem, there can be no doubt that the underlying

15

acts alleged in support of counts 1 and 2—inflicting a "degloving" injury to John Doe 1's penis—could also constitute "child abuse" under Evidence Code section 1360. It would make little sense if Evidence Code section 1360 made John Doe 1's hearsay statements admissible only for the purpose of proving a child abuse offense when the more serious charges are also based upon the same conduct and same injury to John Doe 1.

Accordingly, we find no merit in defendant's argument that Evidence Code section 1360 may only be utilized in cases in which the defendant is specifically charged with a violation of a child abuse statute and further find no error in the trial court's application of Evidence Code section 1360 to the evidence at issue in this case.

B. *Admission of John Doe 1's Statements to the Forensic Pediatrician Were Not Erroneous*

Defendant also argues that the admission of the forensic pediatrician's testimony recounting John Doe 1's statements regarding the cause of his injuries was erroneous. The trial court admitted the testimony pursuant to Evidence Code section 1253, which provides a hearsay exception for statements made by victims of child abuse for the purpose of medical diagnosis and treatment. Again, defendant does not contend that the conditions for admissibility set forth in the statute were not met or the trial court abused its discretion in admitting such evidence. Instead, defendant asserts that as a matter of statutory interpretation, the hearsay exception set forth in Evidence Code section 1253 only applies to criminal prosecutions in which a violation of a child abuse statute is charged. For the same reasons set forth in our discussion of the application of Evidence Code section 1360, we disagree.

16

Evidence Code section 1253 provides in pertinent part: "This section applies only to a statement made by a victim who is a minor at the time of the proceedings, provided the statement was made when the victim was under the age of 12 describing any act, or attempted act, of child abuse or neglect. 'Child abuse' and 'child neglect,' for purposes of this section, have the meanings provided in subdivision (c) of Section 1360. . . ." Because Evidence Code section 1253 specifically incorporates the definition of "child abuse" and "child neglect" set forth in Evidence Code section 1360, subdivision (c), defendant argues that any limitations represented by Evidence Code section 1360, subdivision (c), must necessarily be incorporated into Evidence Code Section 1253. However, we have already rejected defendant's interpretation that Evidence Code section 1360 contains a limitation based upon the charges brought against a criminal defendant. Thus, reference to Evidence Code section 1360 cannot operate to incorporate a limitation that does not exist in that statute, and we equally reject the argument that Evidence Code section 1253 is limited to cases in which a defendant is specifically charged with a violation of child abuse statutes.

*C. No Combined Error Warranting Reversal*

Defendant also asserts that reversal is warranted as the result of the combined error of admitting hearsay statements pursuant to Evidence Code sections 1360 and 1253. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) However, "[a] predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous."

(*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Since we have found no merit in defendant's individual claims of error with respect to the trial court's admission of evidence under Evidence Code sections 1360 and 1253, we also find no merit in defendant's claim of cumulative or combined error.

## D. *The Imposition of Fines and Fees Was Not Erroneous or Prejudicial*

Finally, defendant argues that we must strike the fines and fees imposed by the trial court because the trial court made a finding that she had no ability to pay, rendering the imposition of any fines or fees unconstitutional under *Dueñas*, *supra*, 30 Cal.App.5th 1157, 1160. We disagree with defendant's characterization of the record with respect to the trial court's purported findings as well as defendant's conclusion that it runs afoul of any principles set forth in *Dueñas*.

Here, at the time of sentencing, the trial court stated: "I'm going to impose a $300 restitution fine, a $300 parole revocation fine. I find that at her age she really has no prospects for employment while she is in custody. And I do believe that she no longer has any prospects for any financial assistance from anywhere. *So that's why* I'm assessing the $300 restitution fine and parole revocation fine." (Italics added.) Defendant argues that this statement constitutes a finding that defendant "had no ability to pay any fines or fees." However, we cannot ignore the context in which this statement was made. At the time the trial court made this statement, the evidence before it included a probation department report that recommended defendant be ordered to pay over $1,000 for the costs of preparing the report; a $514.58 booking fee; $1,500 for presentence incarceration costs; a $9,000 restitution fine; a $120 criminal conviction

18

assessment fee; a $160 court operations assessment fee; and a $10,000 parole revocation fine. Thus, when viewed in context, the trial court's statement is properly viewed as its stated reasons for rejecting the probation department's recommendations and instead imposing a lower amount in fines and fees in light of defendant's financial condition.

Contrary to defendant's assertion, the trial court's imposition of fines and fees in this manner does not run afoul of any principles set forth in *Dueñas*. Even assuming *Dueñas* was correctly decided,[10] the case stands for the proposition that a trial court's imposition of fines and fees without first considering a defendant's ability to pay violates due process. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1164, 1172-1173.) *Dueñas* did not declare any of the statutory provisions providing for fines or fees per se unconstitutional, but instead held that due process required consideration of a criminal defendant's financial condition before such fines or fees could be imposed. (*Ibid.*) Here, the trial court's comments imply that it imposed reduced fines and fees after expressly taking into consideration defendant's financial condition. Such a situation does not run afoul of *Dueñas*, but rather applies the very principles that *Dueñas* espouses.

Finally, to the extent defendant's challenge can be construed as an argument she was denied a formal "ability to pay hearing" or an argument that the trial court reached an erroneous conclusion with respect to her ability to pay, we would find no prejudice warranting reversal. Error under *Dueñas* is not reversible per se, but instead subject to a harmless error analysis. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1034-1035.)

---

**10** See *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted November 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055.

Since an alleged error under *Dueñas* involves a violation of due process, we consider whether the error was harmless beyond a reasonable doubt. (*Ibid*.; see *Chapman v. California* (1967) 386 U.S. 18, 24.) Here, the trial court imposed a restitution fine in the amount of $300 (Pen. Code, § 1202.4, subd. (b)); a court operation assessment in the amount of $160 (Pen. Code, § 1465.8, subd. (a)(1)); and a criminal conviction assessment in the amount of $120 (Gov. Code, § 70373),[11] resulting in a total monetary liability of $580. Despite her advanced age and poor health, the probation department report noted that defendant remains entitled to collect $1,500 in Social Security and $550 in retirement funds each month while in custody. The suggestion that defendant will be unable to pay a $580.00 monetary liability over time when she is entitled to collect over $2,000 each month in retirement income while in custody has no merit. Thus, we conclude that even assuming the trial court committed some, unspecified error under *Dueñas*, any such error was harmless and does not warrant reversal.

## IV. DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

FIELDS

J.

We concur:

CODRINGTON

Acting P. J.

RAPHAEL

J.

---

[11] The trial court also imposed but suspended a parole revocation fine.