Filed 11/21/13  P. v. Vega CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL VEGA,<br><br>    Defendant and Appellant. | B240276<br><br>(Los Angeles County<br>Super. Ct. No. YA080547) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Steven R. Van Sicklen, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Daniel Vega of second degree murder (Pen. Code, § 187, subd. (a))[1] (count 1) and assault on a child causing death (§ 273ab, subd. (a)).  The trial court found as to both counts that defendant had suffered one prior serious or violent felony conviction pursuant to the Three Strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), served two prior prison terms (§ 667.5, subd. (b)), and suffered one prior serious felony conviction (§ 667, subd. (a)(1)).

The trial court sentenced defendant to a term of 25 years to life in count 2, doubled to 50 years because of the prior strike conviction.  The court added five years for the prior serious felony (§ 667, subd. (a)(1)) and one year for the prior prison sentence (§ 667.5, subd. (b)).  In count 1, the court imposed 15 years to life doubled to 30 years to life due to the strike conviction, plus five years for the prior serious felony conviction and one year for the prior prison term.  The trial court stayed the sentence in count 1 under section 654.  Defendant's total sentence is 56 years to life in prison.

Defendant appeals on the grounds that:  (1)  the trial court committed reversible error by not instructing the jury that an unintentional killing during an assaultive felony constitutes voluntary manslaughter, and (2)  the judgment must be reversed because the trial court permitted the prosecutor to introduce evidence of prior acts of domestic violence in violation of defendant's right to due process under the Fourteenth Amendment to the United States Constitution.

**FACTS**

**Prosecution Evidence**

In December 2010, Maria Mendoza had three young children:  Adrian, Alexis, and Gabriel, who was two years old.  Defendant had dated Mendoza in high school, and they reconnected after Gabriel was born.  Defendant needed a place to stay, and Mendoza allowed him to move in to her Lomita apartment.  Eventually, Mendoza and defendant began a sexual relationship.  At trial, Mendoza acknowledged she had been convicted of welfare fraud in 2007 and of petty theft.

---

[1]     Unless otherwise stated, all further statutory references are to the Penal Code.

Defendant interacted well with Mendoza's children, but he told Mendoza that she babied Gabriel too much. Defendant called Gabriel a "weenie" and said that he cried a lot. Defendant helped Mendoza to take care of the house. Defendant took over the care of Gabriel, and he bathed the child and changed his diaper.

In February 2011, Mendoza noticed a big bump and bruise on Gabriel's forehead. When she asked defendant about it, he said that Gabriel had fallen in the shower. The only time Mendoza saw defendant hit her children was when he once smacked the back of each of her children's heads when they were walking out of the house. She told him not to touch her kids. They discussed his moving out, but defendant asked her to allow him to stay until April.

On March 2, 2011, Mendoza changed Gabriel's diaper and saw a big bruise in his genital area. Mendoza asked defendant about it, and defendant said Gabriel had slipped in the bathtub while trying to get out. Mendoza did not notice any injuries to Gabriel's legs or stomach. On March 3, Mendoza got her girls ready for school and took them to the bus stop. She did not see any injuries on Gabriel before she left him with defendant. Mendoza asked Gabriel if he wanted to go with her to Covina, but he said he wanted to stay home and watch a television program. Mendoza left Gabriel with defendant and went out to run errands. While she was out, she texted defendant several times but did not receive any responses.

Mendoza returned around noon and found a note on the kitchen counter in defendant's handwriting saying, "I'm sorry, I didn't mean to." Mendoza ran up to her son's room and saw he was in bed, covered with a blanket up to his hairline. She found another note on the bed in defendant's handwriting. Mendoza threw the blanket off her son and saw he was not breathing. Gabriel had a big gash in his chin. Mendoza called 911 and attempted CPR.

Paramedics and firemen arrived. David Alvarez, a fireman paramedic, found in a bedroom the cold and stiff body of a little boy, approximately two years of age. Alvarez pronounced him dead. He noted the laceration under the boy's chin. Aaron James, another paramedic, noticed numerous bruises on the boy's chest and extremities.

3

The medical examiner who performed the autopsy on Gabriel saw on his body a large number of bruises and several abrasions, essentially from head to foot. There were so many bruises, many of them overlapping, that it was impossible to count them. The examiner stated there were over a hundred bruises at a minimum, which he concluded were blows from an assailant. There was evidence of several blows to the mouth area, such as a chipped tooth and a tear in the membrane attaching the lips to the teeth. The laceration to the chin looked very recent. The facial and mouth injuries and the injuries to Gabriel's back and buttock area were consistent with having been inflicted on the day of Gabriel's death. A second degree burn at the base of his index finger was only a few hours old at most when he died. The abrasions on his arm and leg were consistent with being caused by the toe of a shoe. There were multiple injuries to Gabriel's internal organs and substantial internal bleeding. A ruptured intestine had resulted in peritonitis. Gabriel had lacerations of the abdominal tissue and a severed small intestine, which could only have been caused by very severe force. Some of the injuries were older, as shown by tissue examination. Gabriel's cause of death was blunt abdominal trauma. Death was by homicide. The medical examiner was of the opinion that Gabriel died a slow and painful death.

Miguel Ramirez had been friends with defendant since 2009. On March 3, 2011, Ramirez received text messages from defendant between 10:00 a.m. and 11:00 a.m. Defendant said, "What up, homey? Hey, can I ask for a huge favor? . . . Real shit, dog. I'm in trouble. Locked-up-for-life type of shit if I get caught. Don't tell Ruben, please." The next message said, "I just need a place to stay for a couple days until I get out of Cali. If not, it's cool. I'll ask someone else." Ramirez replied, "Yeah, you know I got you. When you coming down?" Defendant said he was coming right away and that he was in Artesia. Defendant arrived at Ramirez's at around noon. Defendant acted paranoid and kept looking out the window. Defendant told Ramirez he had been in a fight with a close friend of his girlfriend. Defendant knocked out the man and then strangled him until there was no pulse. He thought he had killed him. At that point, defendant's cousin, Ruben Castillo, appeared, and defendant stopped talking about it.

4

On that same day, defendant sent several text messages to Castillo asking him to eliminate anything at his house that belonged to defendant or that contained defendant's handwriting. Defendant re-sent that same text message to Castillo one minute later. Defendant also sent several text messages to his mother on March 3, 2011. One message read: "Mom, I'm not all right. Everything is not okay. That's why I'm on the bus. I really messed up big time with no fixing it. This is the first and last time. I'm through." Another text message from defendant read: "If Marisa ask[s] if you have heard from me, say no. Please, it's important." Defendant also wrote, "I'm okay, but everyone knows now. I'm going to have my phone off, but I will call you. I love you. Don't worry. No one knows where I am, I promise." The last message defendant sent his mother read, "I need 72 hours for the APB to clear."

At some point, defendant told Ramirez that he wanted to go to Indiana. Ramirez told defendant that it would be best if defendant left Ramirez's residence. Ramirez did not "want to be in a murder case." Ramirez was not sure if defendant walked away or if he left with Castillo when Castillo left. Ramirez subsequently spoke with Castillo again and told him what defendant had said about a possible murder. They went to Castillo's home and told his parents, and Castillo's father called the police. Later, defendant called Ramirez on his cell phone. Ramirez lied and said he was at his own home. Defendant said he was coming over, and Ramirez went to meet him. Ramirez spoke with defendant outside for a short time. When the police showed up, defendant ran inside Ramirez's house. Defendant locked himself in a bathroom but came out about 15 minutes later and was arrested.

Justin Benford was Mendoza's neighbor. He was acquainted with defendant. Defendant told Benford that Gabriel was "a punk, a pussy boy, a weenie." He said these things on a "couple occasions." Once when Gabriel was in the presence of Benford and defendant, he began shaking because he was cold. Defendant said "he was a little pussy boy, a little weenie, and a little momma's boy." Benford noticed a mark on Gabriel's cheekbone about a month before he died. On the day of Gabriel's death, defendant texted Benford and asked if he had a gun. Benford did not.

5

Diana Morales was defendant's ex-girlfriend, and had a daughter with defendant. Her daughter was born in 2005, and in March 2006, Morales and her daughter were living with her mother. Morales and defendant were "on and off" at that point. On one occasion, defendant went to Morales's residence, and the two of them argued while Morales was holding their child. Defendant grabbed Morales by the neck but let go quickly. The child began to cry. Defendant apologized and left. Morales reported the incident to the police.

In December 2006, Morales arrived home with her daughter to find defendant waiting for her. She drove into the garage and tried to close the garage door with the remote. Defendant blocked the door from closing and it went up again. They began arguing. Morales told police defendant pulled her into the garage and residence by her right arm. When defendant told Morales to go upstairs to her room with him, Morales refused. Morales was crying and defendant was angry that she would not change her mind. She remembered that he grabbed her by the neck "kind of tight" and then let go. When defendant grabbed her hair and tried to pull her up the stairs by the hair, Morales sat down on the stairs. Defendant lifted her by the armpits and pulled her upstairs. Morales was carrying her child the entire time. Defendant managed to get Morales upstairs, but she told him she had to feed her crying child and she was allowed to go back downstairs. Morales ran out of the house and ran toward the neighbor's home. Defendant ran after her and grabbed her from behind, pulling her back into the house. He said, "This can get a whole lot worse." When defendant released her he put both hands around her neck and lifted her off the ground. At no time did defendant strike or attempt to strike his daughter.

**Defense Evidence**

Defendant presented no evidence.

## DISCUSSION

## I. Lack of Instruction on Unintentional Killing During Assaultive Felony

### A. *Defendant's Argument*

Defendant asserts that the trial court should have instructed on voluntary manslaughter as a lesser included offense of both of the offenses with which defendant was charged, i.e. murder (§ 187, subd. (a)) and assault causing death of a child (§ 273ab). Defendant's note to Mendoza constituted evidence of an assault without intent to kill, warranting instruction on the type of voluntary manslaughter set forth in *People v. Garcia* (2008) 162 Cal.App.4th 18 (*Garcia*). Had the jury been so instructed, he asserts, the jury would likely have found him guilty of voluntary manslaughter.

### B. *Proceedings Below*

At the conference on jury instructions, the trial court indicated it was considering whether to give the voluntary manslaughter instruction based on heat of passion. Defense counsel stated for the record that he had requested the instruction. The prosecutor argued that there was insufficient evidence and no foundation to establish that Gabriel did something to provoke defendant. Defense counsel pointed out that Benford said defendant would get upset and had little patience with Gabriel, and Benford would have to tell him to calm down. The court stated that on reflection it believed the prosecutor was correct. There was no evidence as to why this incident occurred, where it occurred or when it did. The jury would be speculating. Therefore, the court withdrew the instruction because it did not believe there was evidence for it.

After the parties rested, defense counsel renewed his request for voluntary manslaughter instructions. He stated that his cross-examination of the medical examiner had shown there was a short amount of time between the injuries and death. This indicated there was "some massive blowup on the part of the person who did these injuries and could have been a result of heat of passion." The trial court denied the request.

7

## C. Relevant Authority

Murder is defined as "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) "Malice aforethought 'may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (§ 188.)" (*People v. Bryant* (2013) 56 Cal.4th 959, 964 (*Bryant*).)

Voluntary manslaughter is a lesser included offense of murder. (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) A defendant is guilty of voluntary manslaughter when he commits an unlawful killing either with intent to kill or with conscious disregard for life but lacks malice, either because (1) he acts in unreasonable self-defense or (2) the killing results from a sudden quarrel or heat of passion on sufficient provocation. (*Id*. at pp. 108-110.) In order for the heat of passion to negate malice, "the passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion'""" other than revenge. (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

Regardless of the relative strength of the evidence supporting convictions of lesser included offenses, the trial court is obliged to give sua sponte instruction on all theories of a lesser included offense that are supported by substantial evidence. (*People v. Breverman*, *supra*, 19 Cal.4th at pp. 159-160, 162.) "In a murder case, this means that both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support." (*Id*. at p. 160) "'Substantial evidence'" means evidence from which a jury composed of reasonable persons could have determined that the facts underlying the giving of the instruction existed. (*People v. Burnham* ( 1986) 176 Cal.App.3d 1134, 1139.)

An inherently dangerous felony is one which, when "viewed in the abstract, 'by its very nature, . . . cannot be committed without creating a substantial risk that someone will be killed,' [citation] or carries a '"high probability" that death will result.'" (*People v. Robertson* (2004) 34 Cal.4th 156, 166-167; *Garcia*, *supra*, 162 Cal.App.4th at p. 28, fn. 4.) A high probability does not mean a greater than 50 percent chance; death need not

8

result in a majority, or even in a great percentage, of instances. (*People v. Robertson*, *supra*, at p. 167; *People v. Clem* (2000) 78 Cal.App.4th 346, 349.)

This Court independently reviews the question of whether the trial court failed to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

### D. No Error

At the outset, we observe that the trial court was correct in its determination that a voluntary manslaughter instruction based on heat of passion, which was the instruction the defense argued for below, was not warranted. Substantial evidence "is not merely '*any* evidence . . . no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"'" that the lesser offense, but not the greater, was committed." (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) There was no evidence presented that justified a heat of passion instruction.

On appeal, the main thrust of defendant's argument is that the evidence in the form of notes in which defendant said he "didn't mean to" constituted evidence of an assault without intent to kill. Therefore, substantial evidence warranted instruction on "*Garcia* voluntary manslaughter." This argument, based on an extrapolation from the reasoning in *Garcia*, *supra*, 162 Cal.App.4th 18, was recently decided adversely to defendant by the California Supreme Court in *Bryant*, *supra*, 56 Cal.4th at p. 970.)

The court in *Garcia* addressed the issue of whether an unintentional killing without implied malice during commission of an inherently dangerous felony could support an instruction for *involuntary* manslaughter, as Garcia claimed, where the merger doctrine precluded application of the second degree felony-murder rule. (*Garcia*, *supra*, 162 Cal.App.4th at pp. 28-29.) The court rejected Garcia's claim that the court had erred by refusing to instruct on involuntary manslaughter on the theory that the killing that resulted from his aggravated assault on the victim "was committed without malice and without either an intent to kill or conscious disregard for human life." (*Id*. at pp. 26, 32-33.) The court reasoned that "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (*Id*. at p. 31.) The *Garcia* court clearly made this statement in the course of its analysis rejecting

9

Garcia's claim, and, as a result, the statement was dictum. Nevertheless, defendant argues the court below should have given a voluntary manslaughter instruction based on the "*Garcia* theory of voluntary manslaughter."

In *Bryant*, our Supreme Court put an end to the erroneous use of this dictum as a purported third theory of voluntary manslaughter. *Bryant* explained, "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that *People v. Garcia*, *supra*, 162 Cal.App.4th 18[,] suggested otherwise, it is now disapproved." (*Bryant*, *supra*, 56 Cal.4th at p. 970.) Thus, neither *Garcia* nor any other citable authority establishes the theory of voluntary manslaughter upon which defendant argues the trial court was required to instruct sua sponte.

Moreover, there was no evidence from which a rational jury could have concluded that defendant's assault on Gabriel was done without implied malice at a minimum. (See, e.g., *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [although defendant testified he intended to stab but not to kill the victim, his act of stabbing her with "all his might" in the abdomen, "an extremely vulnerable area of the body," was substantial evidence of an intent to kill].) Accordingly, the trial court did not err by failing to instruct the jury on voluntary manslaughter.

Finally, contrary to defendant's assertion, voluntary manslaughter is not a lesser included offense of assault on a child resulting in death as charged in count 2. Section 273ab provides, in pertinent part, "Any person, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." Because section 273ab contains no requirement of malice, there is no malice to be negated by a finding of heat of passion. (See *People v. Malfavon* (2002) 102 Cal.App.4th 727 [neither murder nor child abuse homicide is a lesser included offense within the other].)

10

## II. Evidence of Prior Acts of Domestic Violence

### A. Defendant's Argument

Defendant contends the trial court abused its discretion in admitting evidence of prior domestic violence committed by defendant. The court did not explain the relevance of the evidence in its ruling, and the ruling appeared to be based on Evidence Code section 1109 without a thorough Evidence Code section 352 analysis. Because Evidence Code section 352 is instrumental to Evidence Code section 1109's constitutionality, the error violated defendant's right to due process and a fair trial. Even if the court did consider the proper factors, the propensity evidence had an inherent tendency to mislead or confuse the jury, as well as to evoke a strong emotional reaction in the jury.

Defendant also contends that, although the California Supreme Court held in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) that a statute permitting propensity evidence is not unconstitutional, federal authority holds the contrary. He asserts that counsel's objection under Evidence Code section 352 preserved this challenge. If this court should find forfeiture, he contends he was denied effective assistance of counsel.

### B. Proceedings Below

The People filed a motion pursuant to Evidence Code sections 1101, subdivision (b),[2] 1109,[3] and 352[4] seeking to introduce five other acts of domestic violence committed

---

[2]    Subdivision (a) of Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Subdivision (b) of Evidence Code section 1101 provides: "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

by defendant. Prior to argument, the trial court stated it had read the motion and the case cited by the People, *People v. Dallas* (2008) 165 Cal.App.4th 940 (*Dallas*), and had found the case to be very much on point. Referring to a prior in-chambers discussion with the parties, the court believed that at least two of the incidents should be admitted because a child was involved and put in harm's way in connection with defendant's conduct.

Defense counsel objected to all of the incidents, arguing that the two incidents the court had in mind were factually very different from the instant case. In both of those instances, the child's parent was present and was the target of the physical violence. Also, there was no attempt in either instance to harm the child, even if the child was in harm's way. In addition to being factually distinguishable, the incidents were unduly prejudicial under Evidence Code section 352.

The prosecutor argued that the facts and the prior incidents in *Dallas* mirrored those of defendant's case and that defendant's conduct with Morales was admissible, whether or not the conduct was directed at the child. The court agreed with the prosecutor and allowed testimony regarding the two incidents related in the facts portion of this opinion.

---

**3**    Section 1109 provides, in pertinent part: "(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352. [¶] . . . [¶] (c) This section shall not be construed to limit or preclude the admission or consideration of evidence under any other statute or case law. [¶] (d) As used in this section: . . . (3) 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. . . . [¶] (e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice. . . ."

**4**    Section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

### C. Relevant Authority

The exercise of discretion in admitting or excluding evidence is reviewable for an abuse of discretion. Abuse will not be found unless the trial court has exceeded the bounds of reason by exercising its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10; see also *People v. Lewis* (2001) 25 Cal.4th 610, 637; *People v. Kipp* (1998) 18 Cal.4th 349, 369.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

### D. No Abuse of Discretion

"[A]s the Supreme Court has repeatedly and recently reaffirmed, 'when ruling on a[n] [Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under . . . section 352.'" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.)

Here, the record demonstrates the trial court fully understood and properly discharged its responsibilities. The trial court held an in-chambers discussion, read the People's brief, which contained a thorough discussion of the pertinent Evidence Code sections, and read the *Dallas* case.[5] The court heard argument from defense counsel.

---

[5]  "Section 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code

The trial court excluded three of the five incidents the People proposed to present to the jury. In making its ruling, the trial court indicated that it had chosen only those incidents that were more probative than prejudicial under the facts of defendant's case, specifically agreeing with the prosecutor that the facts in these incidents mirrored those in the *Dallas* case. Prior to Morales's testimony, the court read the instruction requested by counsel, entitled "Evidence of Uncharged Domestic Violence."[6]

definition. [Citation.] In *Dallas*, abuse of a baby was admissible pursuant to section 1109 because it was domestic violence within the meaning of Family Code section 6211, although it was not domestic violence within the meaning of Penal Code section 13700, which did not include the baby in its narrower class of protected victims." (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144, citing *Dallas*, *supra*, 165 Cal.App.4th at p. 952.)

[6]    Prior to Morales's testimony, the court read the instruction as follows: "The People presented evidence—or are about to present evidence—that the defendant committed domestic violence that was not charged in this case, specifically a battery, in violation of Penal Code section 243 (e)(1), and corporal injury on a child's parent in violation of Penal Code section 273.5. And then it defines domestic violence as being abuse committed against an adult who is a person with whom the defendant has a child or who has dated or is dating at that time. And it also means abuse committed against either a cohabitant or a former cohabitant. And abuse is also described as meaning intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. And this is how you should consider this evidence: You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. And it goes on to say that if you decide that the defendant committed the uncharged domestic violence, you may, but are not required, to conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and, based on that decision, also conclude that the defendant was likely to commit, and did commit, murder and assault on a child as charged in this case. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder and assault on a child causing death. The People must still prove each charge beyond a reasonable doubt. And you should not consider this evidence for any other purpose."

14

We agree with the court that the prior acts of domestic violence were not impermissibly dissimilar to the charged offenses committed against a child victim. The legislative history of Evidence Code section 1109 shows that the Legislature recognized the special nature of domestic violence as one in which the "'scheme of dominance and control'" "'usually escalates in frequency and severity.'" (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) The evidence of prior acts showed that defendant sought to exercise his control over his ex-girlfriend by using violence. He then chose another victim who was weaker than Morales—a two-year-old boy. This was consistent with a pattern of escalating violence on those persons whose behavior defendant wished to control.

Finally, the evidence of defendant's prior acts of domestic violence was significantly less inflammatory than the charged offense, which is yet another factor weighing in favor of its admission. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 ["[r]elevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct"].) The prior acts were recent, having occurred less than five years before the instant homicide. Testimony about the incidents did not involve an undue consumption of time, since it was limited to two incidents and two witnesses, consisting of approximately 20 pages of transcript for Morales and seven pages for the police officer. In addition, the trial court limited any prejudicial impact of the evidence and any risk of confusing the jury by instructing the jury with CALCRIM No. 852, as noted. (See *People v. Reyes* (2008) 160 Cal.App.4th 246, 251 [jury instruction corresponding to consideration of evidence under Evid. Code, § 1109 is constitutional]; *People v. Pescador* (2004) 119 Cal.App.4th 252, 259-260 [CALJIC No. 2.50.02 [equivalent to CALCRIM No. 852] does not offend the due process clauses].)

"The record as a whole thus shows the trial court undertook a weighing of the probative value and the prejudicial effect of the evidence in making its ruling. [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th at 839, 892.) The prejudice from

admission of the prior conduct was not so great as to substantially outweigh its relevance, and the trial court did not abuse its discretion.

### E.  No Due Process Violation

In *Falsetta*, *supra*, 21 Cal.4th 903, the Supreme Court held that Evidence Code section 1108 does not violate due process principles despite the general rule that propensity evidence is unduly prejudicial.  (*Falsetta*, at p. 917.)  Evidence Code section 1108 was saved from any due process challenge because trial courts "must engage in a careful weighing process under [Evidence Code] section 352" before admitting such evidence.  (*Falsetta*, at pp. 916-917.)  *Falsetta* stated that, rather than admit or exclude every sex offense a defendant has committed, trial judges must consider a variety of factors related to the prior offenses, including the nature of the offense, its similarity to the current offense, its possible remoteness, its likely prejudicial impact on the jurors, and the availability of less prejudicial alternatives to its admission, such as admitting some but not all of the prior sex offenses.  (*Id.* at p. 917.)  Evaluating the evidence under the standards of Evidence Code section 352 is the "safeguard" that ensures admission of evidence of uncharged sex offenses does not result in a fundamentally unfair trial. (*Falsetta*, at pp. 916, 917.)  The required Evidence Code section 352 analysis "strongly supports the constitutionality of [Evidence Code] section 1108."  (*Falsetta*, at p. 916.)

Although the Supreme Court has not addressed the constitutionality of Evidence Code section 1109, the Courts of Appeal have uniformly held that, under the reasoning of *Falsetta*, section 1109 does not violate due process.  (See, e.g., *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Rucker*, *supra*, 126 Cal.App.4th at p. 1120; *People v. Price* (2004) 120 Cal.App.4th 224, 239-241; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. Jam*es (2000) 81 Cal.App.4th 1343, 1353; *People v. Jennings*, *supra*, 81 Cal.App.4th at pp. 1309-1313; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1335; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028; *People v. Johnson*, *supra*, 77 Cal.App.4th at pp. 417-420.)

Defendant criticizes as unsound the *Falsetta* rationale for upholding Evidence Code section 1108 because Evidence Code section 1108 is different from Evidence Code

16

section 1101.  Evidence Code section 1101 requires the propensity evidence to be relevant for some nonpropensity purpose.  Evidence Code sections 1108 and 1109, on the other hand, expressly vitiate the Evidence Code section 1101 bar against use of propensity evidence.  *Falsetta*'s reasoning is also unsound because Evidence Code section 352 provides only an illusory safeguard.  Prejudice always outweighs probative value due to the inherent prejudicial nature of the evidence and the inherently slight probative character of it, shown by the lack of a direct inference from a prior act to the charged act.  Defendant also asserts that the judiciary completely abdicated its role of evaluating legislation for its constitutionality in *Falsetta*.  Evidence Code section 1109 purports to permit introduction of evidence for the sole purpose of proving propensity in violation of the federal constitutional prohibition of state laws permitting introduction of such evidence.  According to defendant, admission of such evidence even when authorized by statute violates due process where it "'violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.'"

Like defendant, the appellant in *Falsetta* argued that the rule against admitting propensity evidence "is a fundamental principle of justice long recognized as necessary to assure due process." (*Falsetta*, *supra*, 21 Cal.4th at p. 913.)  The high court agreed that the rule against admitting propensity evidence has had longstanding application. (*Id*. at p. 913.)  "Yet a long-standing practice does not necessarily reflect a *fundamental*, unalterable principle embodied in the Constitution." (*Id*. at p. 914.)  The court found that "the trial court's discretion to exclude propensity evidence under section 352 saves [Evidence Code] section 1108 from defendant's due process challenge." (*Id.* at p. 917.)  The trial court has the opportunity to consider whether the probative value of the challenged evidence would be outweighed by its prejudicial impact. (*Id*. at pp. 917-918.)  The court also reasoned that the prosecution still has the burden to prove the defendant's guilt beyond a reasonable doubt and a jury is instructed that the defendant is presumed innocent. (*Id*. at p. 920.)

17

Accordingly, we reject defendant's federal due process challenge to Evidence Code section 1109. Although *Falsetta* addressed the constitutionality of Evidence Code section 1108, its reasoning demonstrates that none of defendant's arguments have merit. As *Falsetta* requires, the jury here was instructed that it had to find that defendant committed the charged crimes beyond a reasonable doubt in order to convict him. Under the facts of this case, there is no indication that the admission of the evidence of domestic abuse improperly lessened the prosecution's burden. Defendant has failed to persuade this court to reconsider *Falsetta*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                                    BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____
*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


18