Filed 12/12/24; certified for publication 12/31/24 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082237 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD288314) |
| ANGEL GARCIA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge. Reversed and remanded.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Angel Garcia.

Marcia Clark, under appointment by the Court of Appeal, for Defendant and Appellant Armando Alvarado.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Angel Garcia and Armando Alvarado (together appellants) are members of Logan Red Steps (Logan), a criminal street gang in San Diego. A jury convicted them of murdering Eduardo S. (Pen. Code,[1] § 187, subd. (a), count 1) and found true a robbery murder special circumstance (§ 190.2, subd. (a)(17)). It also found them guilty of attempting to murder Ruben T. (§§ 664, subd. (a) & 187, subd. (a), count 2), and robbery (§ 211, count 3). The jury found Alvarado guilty of shooting at an occupied structure (§ 246, count 5) and Garcia guilty of an additional robbery count related to a separate incident. The jury also found true firearm allegations attached to counts 1 and 3 for Garcia and counts 2 and 3 for Alvarado. As to both appellants, the trial court imposed life without the possibility of parole on count 1 and the attached robbery murder special circumstance.

Appellants argue the trial court prejudicially erred by (1) admitting gang-related evidence after bifurcating the gang enhancements; (2) excluding evidence that Eduardo had told his girlfriend he had stolen a BB gun; and (3) refusing to instruct on the alleged lesser included offenses of second degree murder and voluntary manslaughter. Garcia contends the cumulative effect of these errors requires reversal. Appellants claim imposition of life without the possibility of parole constituted cruel and unusual punishment. Alvarado also argues the court erred by: (1) failing to dismiss a firearm enhancement regarding the attempted robbery; and (2) not staying the concurrent sentence for shooting at an occupied dwelling. Finally, Alvarado contends, and the People concede, Alvarado is entitled to nine more days of actual custody credit and the abstract of judgment requires correction.

---

[1] Undesignated statutory references are to the Penal Code.

We conclude the trial court prejudicially erred by admitting the gang-related evidence and reverse appellants convictions. This conclusion moots appellants' claims of posttrial error. For the trial court's benefit, we address appellants' arguments regarding exclusion of the stolen BB gun, as this issue may arise again on remand. Given our conclusion that appellants' convictions must be reversed, we decline to offer an advisory opinion on their claims of instructional error. What instructions are required or appropriate will depend in large part on the theory or theories of liability pursued by the prosecution and the evidence presented in the event of a retrial. Any argument thereon should be addressed to the trial court in the first instance.

## FACTUAL BACKGROUND

Eighteen-year-old Eduardo showed his friend, Ruben, a social media video of a ghost gun (a gun without a serial number) he wanted to purchase for $700 or $750. The gun was black on the bottom and bronze on the top. A few days later, on November 25, 2020, Ruben and Eduardo had plans to hang out that night and shoot BB guns at the home of their friend Joel S. Eduardo picked up Ruben, telling him that he planned to purchase the ghost gun before going to Joel's home. Ruben brought his BB gun with him. It had a wooden stock and looked like a rifle. He jammed the BB rifle between the front passenger seat and a plastic pillar so it could not be seen from outside the car.

As planned with the seller, Eduardo drove his car to the back parking lot of a particular store in Point Loma where the seller would enter Eduardo's car to conduct the transaction. It was dark outside when Eduardo and Ruben arrived at the parking lot but some lighting existed in the area. Eduardo backed into a parking spot next to two people and left his engine running. The two people wore all black and had "Covid" masks on their faces. After Eduardo unlocked his car doors, Garcia opened the rear driver's side door and got into the back

seat with Alvarado following behind him.  Eduardo pulled out of the parking space and began driving slowly in the parking lot.

According to Ruben, Garcia displayed the ghost gun, pointed it at Ruben's head, and asked, "Where's the fucking money?"  Ruben immediately ducked his head between his knees, opened the front passenger door, and dove out of the car.  While still in the car, Ruben heard two gunshots and Eduardo grunt from being shot.

Ruben started running away and ultimately took refuge inside a store.  Another nearby person heard some pops and saw Eduardo's car accelerate and crash into a retaining wall.  Ruben called three friends, asking them to pick him up and telling them that he and Eduardo had just been robbed.  One of his friends picked him up, he ultimately got home about an hour after the incident and told his parents what had happened.  His parents then contacted an attorney who instructed them to wait at the house for police to arrive.

Meanwhile, police officers responded to scene.  Firefighters extracted Eduardo from the car and paramedics tried to resuscitate him.  When the paramedics arrived at the hospital and pulled Eduardo's stretcher out of the ambulance, $705 in cash fell out of his pocket.  Eduardo never regained consciousness, had two gunshot wounds, and died from blood loss caused by a gunshot that entered his back and perforated his heart and lungs.

Police searched Eduardo's car and found the loaded ghost gun on the front passenger seat and Ruben's BB rifle on the front passenger seat floorboard.  The officer who found the BB rifle believed it was a relatively weak one-pump BB rifle that looked like a toy.  Among other things, police found a black hair in a large spider web-like crack in the windshield of Eduardo's car.  In the backseat, they found a black hat, red hat, and black sweatshirt that said, "In loving

memory of Brian Romo 7/19/2005 to 10/23/2020."[2]  Police found a red iPhone belonging to Alvarado beneath the floormat on the passenger backseat of the car.  Another black hat with a "SD" logo on it was found in the rear passenger compartment.

Garcia's DNA was on several parts of the ghost gun, the ghost gun's magazine, the sweatshirt, the black hat in the backseat, and on the inside of the windshield.  Alvarado's DNA was found on the interior of the hat with the "SD" logo.  Police subsequently determined that the ghost gun was operable and a MXT brand cartridge casing found inside the car came from the ghost gun.  A Remington brand cartridge casing also found inside the car came from a different gun.

Detectives obtained search warrants to gain access to cell phones belonging to Alvarado and Eduardo and to the social media accounts of Eduardo, Garcia, and a person named Jhason S.  Messages revealed Eduardo and Garcia became "friends" on a social media site two days before the incident with Eduardo indicating he wanted to purchase a firearm.  Jhason posted a photograph of guns on a chair being sold for specific prices, including the ghost gun for $550 and said he would pass on any interest in the guns to his friend.  Police later found another photograph and an audio file indicating the ghost gun cost $700.

Jhason sent Garcia an audio message where he said he "was going to slide you this fools '@' so you can rob him."  Jhason also sent an audio message to Garcia's account that "he" (apparently meaning Eduardo) wanted the gun and Jhason told "him" it cost $750, and asked Garcia "save him" $150 or at least $50.

---

[2]    A prosecution witness testified regarding a photograph showing Romo, a known Logan gang member, who was shot and killed in October 2020. Garcia was shown in a photograph with Romo.  Other Logan gang members wore sweatshirts with Romo's name, photo, and dates of birth and death.

A photograph posted on Garcia's account offered guns for sale with their prices, including the ghost gun for $700.

The following month, police arrested appellants. Police conducted a videotaped undercover operation in Alvarado's jail cell with a sheriff's detective and two other individuals pretended to be fellow jail inmates. The three individuals posed as fellow inmates and talked to Alvarado about the incident. During the undercover operation, Alvarado admitted being a Logan gang member and stated police found his phone where the homicide occurred. Alvarado stated the person he was with "messed up," the incident was not gang related or involve gang enemies and "was supposed to be just a robbery." He said the incident occurred behind a store and they had it all planned out. Alvarado stated the person he was with got in the car with "fucking La Jolla white boys" and one of the white boys pulled out a BB gun that looked real to him, so he pulled out his gun, claiming he "got" one of the white boys.

Alvarado said they were going to rob the white boys but those boys were also planning to rob them. When the passenger with the BB gun saw Alvarado's gun, he threw the BB gun and ran out of the car. Alvarado fired his gun at the passenger and believed he had shot the passenger. Alvarado's "homie" believed Alvarado had been shot and fired his gun at the driver.

The car then ran into a wall. Alvarado stated it was "foggy" inside the car and he grabbed whatever he could, including a wallet that he took and two guns that he threw away. Alvarado did not realize Ruben had pointed a fake gun at him until he accidentally took it from the car after the incident. When Alvarado realized the gun was fake, he threw it away. He later checked the wallet, discovered it contained money, and took the money. Alvarado claimed about five "homies" were there, saw what had happened and left.

6

DISCUSSION

## I. PREJUDICIAL ERROR ADMITTING GANG EVIDENCE

A. *Background*

The amended information alleged appellants committed counts 1 through 5 to benefit a criminal street gang under section 186.22, subdivision (b). The court granted the motion of both defense counsel to bifurcate the gang allegations under section 1109 after the prosecutor conceded bifurcation was required upon request. Nevertheless, the prosecution sought to admit gang-related evidence to prove motive, intent, uncharged conspiracy, aiding and abetting, and that Alvarado was a major participant who acted with reckless indifference to human life. The prosecutor also argued postarrest evidence of Garcia's new tattoos showed consciousness of guilt by celebrating and taking credit for the crimes.

The court concluded evidence of Logan's violent nature and its engagement in illegal activities was admissible pursuant to Evidence Code section 352 because Alvarado's reference to other homies being there shows the robbery "was a coordinated, planned robbery with the assistance of gang members and as a result of the gang-related type of activity that the Logan Red Steps engage in." It found the gang evidence was relevant to prove appellants' "intent, motive, conspiracy and aiding and abetting." The court also ruled the gang expert could explain and interpret appellants' tattoos.

At trial, detective Kevin Janknowski testified as a gang expert for the People. He explained that he had spent the last five years of his career working on Logan gang cases. He investigated crimes involving Logan gang members, including numerous shootings "that were not initially known to be gang-related, but wound up being gang-related." Jhason and appellants were all about the

7

same age at the time of the incident (18 to 19 years old), were Logan gang members, and had about the same level of seniority in Logan.

When asked why the police monitor gang members, Janknowski replied: "So gang members, by their very nature, are extremely dangerous. And it's . . . a growing problem within the city of San Diego. Gang members operate by a different set of rules." The court took a break to consider a lack of foundation objection. The court ruled that "this witness has not shocked the conscience of the jury, so I'm not going to agree with you on that, [defense counsel]. I see the majority of what's been testified to up to this point as foundational."

The court then stated: "And then I think more than anything, the reason the court allowed limited testimony about gang evidence in this case is because there was overwhelming evidence to corroborate, based upon photos, videos, and tattoos, that the jury could find that each of the defendants in this case are members of the Logan Heights Red Steps. [¶] Then the issue was beyond that, a limited inquiry with respect to—was more an issue of loyalty and how they operate together and how they operate in concert with each other in a very limited way."

When back on the record, Janknowski stated Logan existed to commit violent crimes, as well as other illegal activities, and he monitored Logan to prevent violent crimes. Logan gang members either use hand signs or symbols such as tattoos or graffiti to claim a territory, threaten community members, indicate to other gang members and community members that they are gang members and to identify each other as being gang members from that particular set. The whole point of the Logan gang is to commit violent crimes and Logan gang members frequently commit crimes together because it allows the gang members to trust each other and gives them a greater chance of success.

Logan gang members "are very proud" to be part of Logan and "frequently get all sorts of different tattoos that generally signify to not only themselves but to other members of their gang that they're proud of being [Logan] gang members." They will get tattoos to commemorate a gang member's death or some violent act they committed on behalf of the gang, typically in places where the tattoos are obvious to not only other gang members, but also members of the public. Logan gang members will also get tattoos while in custody to commemorate the event for which they are in custody. A deputy sheriff who worked in a detention facility testified that on February 17, 2021, he noticed Garcia had two fresh tattoos, "LH" on the right cheek of his face, and another "LH" on his right hand. The tattoos are associated with the Logan gang.

Logan gang members increase their status within the gang by killing someone in association with another Logan gang member. Logan gang members are expected to arm themselves to conduct gang business. Logan gang members do not exclusively carry weapons for protection and Janknowski has investigated numerous shootings where Logan gang members have offensively attacked rival gang members or general members of the public, either by shooting them or displaying a firearm in such a manner that persons feared for their safety.

B. *General Legal Principles*

"Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of [gang-related] evidence if it is only *tangentially* relevant to the charged offenses." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).) In 2021, "the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), known as the STEP Forward Act of 2021." (*People v. Burgos* (2024) 16 Cal.5th 1, 7.) Among other things, Assembly Bill 333 "added . . . section 1109, which

9

provides that, if requested by the defense, a trial court must try a gang enhancement charge separately from the underlying offense." (*Burgos*, at p. 7.) "In enacting Assembly Bill 333, the Legislature made several findings and declarations related to . . . section 1109's bifurcation provisions. The Legislature declared that '[g]ang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people.' " (*Burgos*, at p. 10.)

Nonetheless, section 1109 does not disturb existing case law holding that gang evidence may be admitted to prove substantive crimes. (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).) Generally, gang evidence "is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*Albarran*, *supra*, 149 Cal.App.4th at p. 223.) For example, gang evidence " 'can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Chhoun*, at p. 31.)

If gang "evidence is found to be relevant, the trial court must carefully scrutinize [such] evidence before admitting it because of its potentially inflammatory impact on the jury." (*Albarran*, *supra*, 149 Cal.App.4th at p. 224.) Under Evidence Code section 352, the trial court may, in its discretion, exclude gang evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. The decision on whether gang evidence is relevant and not unduly prejudicial rests within the broad discretion of the trial court. (*Albarran*, at pp. 224–225.) We will not disturb a trial court's exercise of discretion " ' "except on a showing that the [trial] court exercised

10

its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.* at p. 225, italics omitted.) The appellant bears the burden to demonstrate abuse of discretion and prejudice. (*Ibid.*)

"Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.) We apply the *Watson*[3] test to determine whether admitting this evidence was prejudicial. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1208–1209.) The analysis " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

C. *Analysis*

After properly bifurcating the gang enhancements, appellants contend the trial court erred by admitting gang-related evidence during trial of the substantive crimes. They contend this evidence was far more prejudicial than probative and its erroneous admission violated their rights to due process and a fair trial. As we will explain, no admissible evidence existed showing the crimes had any connection to the Logan gang. Additionally, the gang-related evidence was either cumulative of other admissible evidence, or not relevant to proving

---

3    *People v. Watson* (1956) 46 Cal.2d 818, 836.

the substantive crimes.  Accordingly, admission of this evidence led to a miscarriage of justice and appellants' convictions must be reversed.

Although appellants and Jhason are Logan gang members, there is no evidence in the record indicating gang signs were thrown, gang threats were made, or that the crime occurred on gang territory.  The trial court concluded, however, that Alvarado's reference to other "homies" being at the scene shows the crime was gang related.

During the undercover operation, Alvarado stated five "homies" were at the scene but they left after hearing the gunshots.  The transcript of the undercover operation does not support the court's implied conclusion that Alvarado's reference to "homies" meant other Logan gang members.  Alvarado described Garcia as "his friend" and described the other individuals who were at the scene before fleeing as "friends."  Two prosecution witnesses testified that Alvarado likely gave a truthful account during the undercover operation and both believed he had been truthful.  During the undercover operation Alvarado acknowledged being a Logan gang member.  Notably, one of the undercover operatives testified that gang members are comfortable indicating when certain actions are done for a gang and he did not believe that during the undercover operation Alvarado made any statements indicating the incident was gang related.

Finally, during the undercover operation, Alvarado denied committing the robbery for any gang-related purpose.  That exchange went as follows:

> "Salas:  "And how did that one play out, perrito?  That one was gang related, enemigos or?  Translation:  "And how did that one play out, dog?  That one was gang related, enemies, or ?

> "Alvarado:  "No, it wasn't it was just—

12

"Salas:  "Some random shit, stupid shit.

"Alvarado:  "It was supposed to be just a robbery."

The People argue it is unclear from this exchange whether Alvarado was saying the crime was not at all gang related, or if he was only saying the crime did not involve a Logan gang enemy.  We believe a fair reading of this exchange shows Alvarado denied *any* gang purpose, including no purpose related to a Logan gang enemy.  One of the undercover participants interpreted this exchange as Alvarado stating the incident was not gang related.  This same operative stated such operations are more likely to elicit truthful information than the usual police interrogation because the person is unaware he's talking to a police officer.  A detective who listened to the operation live stated Alvarado had no idea he was speaking with undercover operatives and confirmed Alvarado was being truthful in this situation.  Jankowski confirmed the transcription reflected a denial by Alvarado of any gang-related activity or involvement with gang enemies.

Thus, the evidence, and inferences therefrom, suggest the unknown people that Alvarado claimed were present, were not there for a gang purpose and the incident was not gang related.  Even assuming an inference can be drawn that the crimes were gang related, the gang evidence admitted at trial had little, if any, relevance to proving the substantive crimes.

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  The court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue

13

consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Before trial, the court found gang evidence relevant to prove, "intent, motive, conspiracy and aiding and abetting" between appellants. The court also ruled the gang expert could explain and interpret appellants' tattoos. The People do not argue the gang-related evidence admitted at trial was relevant to identity or motive. Instead, they contend this evidence was relevant to prove: (1) a conspiracy and aiding and abetting; (2) intent to rob; and (3) that Alvarado was a major participant in the shooting. We are not persuaded.

The People claim the court properly found the gang evidence relevant to prove appellants' intent to rob Eduardo. The People, however, provided no analysis explaining how the gang-related evidence proved this intent. Arguments such as this that "are bereft of factual underpinning" require no discussion." (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282.) In any event, the People's assertion is meritless. During the undercover operation, Alvarado admitted he and Garcia were together to commit a robbery. Accordingly, gang evidence was not required to prove appellants' intent to rob Eduardo.

" 'Evidence is sufficient to prove a conspiracy . . . "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 145.) The People claim gang evidence was relevant to show a conspiracy between appellants and Jhason to commit robbery, the underlying crime for the felony murder charged in count 1.

Specifically, the People contend the evidence showing appellants' and Jhason's membership in the same gang was required to support the inference of

14

a conspiracy and show they had agreed to rob Eduardo because no direct evidence existed that (1) appellants agreed with Jhason's suggestion to rob Eduardo, and (2) Alvarado's admission during the undercover operation that they were supposed to commit a robbery never mentioned Garcia by name. While we agree no direct evidence established these two points, other circumstantial evidence established these points without the need to present any gang-related evidence.

During the undercover operation Alvarado never mentioned Garcia by name. Nevertheless, abundant evidence existed showing Alvarado's relationship with Garcia and Garcia's participation in the shooting. Jankowski testified that social media posts between appellants revealed a preexisting relationship dating back to about 2019. Evidence collected at the scene contained appellants' DNA on items inside Eduardo's car, including the ghost gun. This evidence shows Garcia's participation in the shooting.

Other evidence adduced at trial showed appellants' relationship. Alvarado stated he was with one person and Ruben confirmed two people arrived for the gun sale transaction. Alvarado referred to the person with whom he committed the robbery, Garcia, as his "friend." Garcia used Alvarado's phone to plan the robbery with Jhason. Jhason sent Garcia an audio message where he said he "was going to slide you this fools '@' so you can rob him." Jhason also sent an audio message to Garcia's account that "he" wanted the gun and Jhason told "him" it cost $750, and Garcia should "save him" $150 or at least $50 from the sale. Significantly, Garcia's cell phone and Alvarado's cell phone contained the same message stream with Eduardo regarding sale of the ghost gun and meeting at the location where the incident occurred. This evidence shows the existence of a conspiracy to rob Eduardo without the need to present any gang

15

evidence.  This evidence also shows aiding and abetting without the need to refer to any gang-related evidence.[4]

The People also fail to convince us they required gang-related evidence to show Alvarado was a major participant in the robbery.  To find Alvarado guilty of Eduardo's murder, the People were required to prove he was a major participant in the robbery and acted with reckless indifference to human life. (CALCRIM No. 540B)  The People do not contend gang evidence was required to prove a reckless indifference to human life, which is a fact based inquiry.  To determine whether Alvarado was a major participant in the robbery the court instructed the jury to consider all the evidence and certain factors, including: (1) What was the defendant's role in planning the crime that led to the death?; (2) What was the defendant's role in supplying or using lethal weapons?; (3) What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participants?; (4) Was the defendant in a position to facilitate or to prevent the death? (5) Did the defendant's action or inaction play a role in the death?; and (6) What did the defendant do after lethal force was used?

Garcia used Alvarado's phone to plan the robbery with Jhason.  Garcia's cell phone and Alvarado's cell phone contained the same message stream with Eduardo regarding sale of the ghost gun and meeting at the location where the incident occurred.  Thereafter, Alvarado and Garcia got into Eduardo's car, both

---

[4]     A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  Companionship, and conduct before and after the crime, are factors that may be considered in deciding aiding and abetting. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322.)

armed with a loaded firearms, which they used. This evidence showed Alvarado's major participation in the incident without the need for any gang-related evidence.

Here, the evidence presented at trial concerning the Logan gang lacked probative value because it was largely irrelevant to prove intent, motive, conspiracy, aiding and abetting, or that Alvarado was a major participant. The gang evidence, however, was inflammatory and prejudicial because it informed jurors that appellants belonged to a gang whose primary purpose was to commit violent crimes, gang members frequently commit crimes together, and killing someone in association with another Logan gang member increases that person's status within the gang. The jury also learned that Logan gang members will get tattoos while in custody to commemorate the event for which they are in custody and Garcia obtained two Logan tattoos on his face and hand while in custody.

To the extent the gang-related evidence had *any* relevance to prove the substantive crimes, the issue becomes whether the prejudicial nature of this evidence exceeded its probative value. As detailed above, the probative value of the gang-related evidence was minimal at best. Moreover, to the extent appellants' membership in the same gang had any relevance to the substantive crimes, it was cumulative of other evidence in the record showing appellants knew each other and, as Alvarado stated, were friends. (*People v. Maestas* (1993) 20 Cal.App.4th 1482, 1495 [in case with compelling and overwhelming other evidence of codefendants' close relationship and affinity for one another, evidence they allegedly belonged to the same criminal street gang was cumulative and prejudicial].)

"As part of the [Evidence Code] section 352 prejudice analysis, courts consider whether the trial court gave a limiting instruction. A limiting instruction can ameliorate [Evidence Code] section 352 prejudice by eliminating

17

the danger the jury could consider the evidence for an improper purpose." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 247.) Here, the trial court gave the standard limiting instruction, CALCRIM No. 1403 telling the jury it could consider evidence of gang activity for the limited purpose of determining intent, motive, aiding and abetting, conspiracy, and in evaluating credibility.[5]

We normally presume jurors follow such instructions (*People v. Homick* (2012) 55 Cal.4th 816, 866–867), however, there are "times when the evidence is so potent or inflammatory that this presumption is overcome." (*People v. Dallas* (2008) 165 Cal.App.4th 940, 958.) We need not address the question whether this is one of those times where the presumption is overcome because CALCRIM No. 1403 allowed the jury to use the evidence to "evaluate the credibility or believability of a witness." While there is no dispute that Alvarado shot at Ruben and Garcia shot and killed Eduardo, what led to these shootings was largely a credibility contest between Ruben and Alvarado. Garcia's counsel recognized this fact in closing argument—that Ruben's version of the evidence

---

[5]     CALCRIM No. 1403 provided:  "You may consider evidence of gang activity only for the limited purpose of deciding whether:
- A defendant acted with the intent, purpose, or knowledge that are required to prove the crimes, allegations, and special circumstance charged.
- A defendant had a motive to commit the crimes charged.
- A defendant aided and abetted another defendant in the commission of the crimes charged in this case.
- A defendant or uncharged co-conspirator intended to participate in a conspiracy in this case.

You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.  [¶]  You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

would lead down the path of guilt, while Alvarado's version of the evidence shows Ruben pulled out a gun before appellants started the robbery.

" 'Legions of cases and other legal authorities have recognized the prejudicial effect of gang evidence upon jurors. [Citations.]' [Citation.] That prejudice not only affects the jurors' assessment of the defendants' credibility, but also taints their view of events with the inference of the defendants' criminal disposition." (*People v. Memory* (2010) 182 Cal.App.4th 835, 862, fn. omitted.) The risk of injecting undue prejudice is particularly high where, as here the gang enhancement allegations have been bifurcated and the probative value of the gang evidence is minimal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050.)

Alvarado's and Ruben's credibility was central to the case and admission of the gang-related evidence which had little, if any, relevance to the substantive crimes, likely bolstered the People's case by tarnishing Alvarado's credibility in the jurors' minds, and painting appellants as violent gangsters. Ruben agreed the gun sale transaction was supposed to be quick, he did not know why Eduardo drove after appellants got inside the car, and agreed this did not make sense. Ruben denied trying to rob appellants and denied ever discussing the idea of robbing appellants in lieu of paying for the gun. But other evidence cast serious doubt on Ruben's credibility.

About a year after Eduardo died, Ruben lied to police for a friend who was trying to get money from a fake insurance claim. He pled guilty and was on probation at the time of trial. Ruben admitted to lying to the police a second time regarding a friend who crashed his car during a street race, even going so far as to stage the scene to appear as an accident. Finally, after Ruben received a "fix it" ticket to correct some issues regarding his car, he went into court with

19

a document stating the issues had been remedied. He admitted the document was fake and he had lied to the court.

We next consider what impact the prosecutor's argument may have had on the prejudice resulting from admission of the gang-related evidence. For purposes of determining whether the error was harmless we may consider whether the prejudicial effect is reduced or exacerbated by a prosecutor's closing argument. (See *People v. Miller* (1963) 211 Cal.App.2d 569, 577 ["We feel that the effect of any impropriety [of questions asked by the prosecutor on cross-examination of defendant] was cured by the statement of the district attorney in his argument to the jury."].)

During closing argument, the prosecutor emphasized the gang nature of the murder. Immediately after thanking the jury for their attention, she argued Jhason, appellants and other Logan gang members conspired to commit armed robbery for their own profit and to profit the gang. She commented that Garcia got tattoos while in jail to commemorate the work he did for the gang. Toward the end of her argument the prosecutor stated:

> "And then we have the criteria of what is the individual's knowledge of the person he is committing the crime with[.] This, ladies and gentlemen, is why you heard about the gang evidence in this case. It's because it goes to an element of the crime. And I want to be very clear about the purpose and the nature and the scope of gang evidence in this case. It is a complicated world out there. There are people who have associations and friendships with individuals who might be criminally involved, involved in gangs, what have you. That doesn't necessarily mean that you're a horrible person or you're ever going to do anything that comes to the level of killing anyone.
>
> "So the gang evidence that you received in this case is not being offered or argued to try to say that someone is a bad person or someone is predisposed to commit a crime. But what you can consider that evidence for is Armando

20

Alvarado's knowledge and Angel Garcia's knowledge about what it is that they are signing up for. And so that gang evidence is heard by you for that very specific purpose.

"So to begin, you heard about the Logan Red Steps. They are not the Girl Scouts. They are not a book club. They are not a pickle ball league. They are a criminal enterprise. They exist for the primary purpose of criminal activity within San Diego to include violent crime. And so you know that if you are a Logan Red Step gang member that is what it is you are signing up to do with your fellow gang members.

"There are also expectations that come with being a Logan Red Step gang member. You are expected to be armed on behalf of gang business. You are expected to rely on other gang members and have them rely on you in the commission of gang business. You are expected to back each other up.

"You also have a longstanding nature and the closeness of the relationship that Armando Alvarado and Angel Garcia have. You saw that photo where Angel Garcia calls Armando Alvarado his stepbrother from a year before this ever took place. That photo captured from December of 2019. They have their matching "619" tattoos. These are not individuals who met the day that this crime happened or the week before this crime happened. These are individuals who know each other well. They trust each other. And they know what the expectations are for that lifestyle that they've signed up for. It's this."

The prosecutor emphasized other gang members were at the scene for "reinforcement"—reiterating this point three times. As we will explain, this argument is unsupported by admissible evidence. During a hearing on the motions in limine, the court "painstakingly" reviewed court's exhibit 2 with counsel, the entire transcript of the undercover operation, and ruled on what portions would be given to the jury. Based on the court's rulings, the People

created People's exhibit 130, the revised video and audio recording, and People's exhibit 130A, the written transcript.

In court's exhibit 2, the unofficial copy of the transcript, when one of the undercover operators asked Alvarado whether "[t]hey went together like for reinforcement" Alvarado responded: "Uh-huh, one supposedly I don't he said he got off and shot at the one who was the one that was running, but I don't even believe him." Alvarado's counsel requested that lines 20 to 24, Alvarado's response, be deleted because it was unclear what Alvarado was referring to when he responded. The court interpreted Alvarado's response as referring to an individual who drove appellants to the scene and who may have fired a weapon. Alvarado's counsel interpreted the response as other people later informing Alvarado that when Ruben fled the scene someone other than appellants may have fired a weapon at Ruben.

After the prosecutor stated she had "no strong feelings" about this evidence, the court ruled that lines 20 through 24 would be deleted. In accordance with this ruling, the transcript given to the jury contains no response from Alvarado after the undercover operator asked him whether "[t]hey went together like for reinforcement." At trial, during redirect, this undercover operator violated the court's in limine ruling by stating Alvarado *agreed* the individuals were there for reinforcement and not just to provide Alvarado a ride after the robbery. The prosecutor then relied on this improper testimony to argue to the jury that the unknown individuals acted as gang reinforcement.

Finally, during rebuttal argument, the prosecutor stated: "[Defendants] did everything they could to make this crime as dangerous as they could possibly make it. When you have handguns in the hands of any person with bad intentions, that is a recipe for dead. When you have guns in the hands of armed gang members who are planning on using them and are prepared to use them

and, in fact, do, death is a foregone conclusion." The prosecutor's argument exacerbated the prejudicial effect of the gang-related evidence.

We conclude the probative value of the gang-related evidence was de minimis and substantially outweighed by a probability admitting that evidence would unduly prejudice appellants. The jury heard that appellants were Logan gang members, gang members are extremely dangerous, the purpose of the Logan gang is to commit violent crimes, gang members frequently commit crimes together, and obtain status within the gang by killing.[6] This evidence fell squarely within the legal definition of prejudice because it evokes an emotional bias and had no evidentiary value in proving the substantive crimes. The prejudice created by the nonprobative gang-related evidence was undoubtedly intensified by how the prosecutor used the evidence in closing argument. By portraying appellants' as violent gangsters, the gang-related evidence harmed Alvarado's credibility and unjustly bolstered Ruben's credibility, whose trustworthiness was otherwise doubtful.

Having reviewed the entire record, we find "at least such an equal balance of reasonable probabilities as to leave [us] in serious doubt as to whether the error has affected the result. But the fact that there exists at least such an equal balance of reasonable probabilities necessarily means [we must be] of the opinion 'that it is reasonably probable that a result more favorable to [appellants] would have been reached in the absence of the error.' " (*Watson*,

---

[6] The trial court's decision during trial to admit gang evidence to establish that appellants were gang members raises concerns as it seems to override its earlier ruling that such evidence was relevant only to demonstrate "intent, motive, conspiracy, and aiding and abetting" among appellants. In cases like this, where gang enhancements are not at issue, gang-related evidence is inadmissible unless it is logically relevant to a material issue in the case beyond character evidence. (*Albarran*, *supra*, 149 Cal.App.4th at p. 223.) Here, the record does not indicate appellants' gang membership was material to the case.

*supra*, 46 Cal.2d at p. 837.) For purposes of *Watson* review, "a hung jury is a more favorable result than a guilty verdict." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.) Because the court prejudicially abused its discretion under Evidence Code section 352 by admitting the gang-related evidence, we reverse appellants' convictions.

## II.  NO ERROR IN EXCLUDING STOLEN BB GUN EVIDENCE

### A. *Background*

Eduardo sold marijuana. Before trial, Garcia's counsel moved to admit evidence from Eduardo's girlfriend, N.Z., that Eduardo had previously "robbed" a rival marijuana dealer of his "stuff," including a firearm. At a pretrial hearing, the court informed counsel it would conduct an Evidence Code section 402 hearing to establish the relevancy of the proposed evidence.

At trial, Ruben testified that Eduardo had a replica firearm that looked like a handgun. Ruben did not see Eduardo with anything that resembled a gun the night of the incident. He also did not know if Eduardo had a real gun or a replica handgun in the car that night. At the Evidence Code section 402 hearing, N.Z. stated she had dated Eduardo for two years. She knew Eduardo had two handguns, one small and silver, and the other black and longer. She rarely saw the silver handgun in Eduardo's car, and never saw the black handgun in person. Eduardo also had a small black BB handgun with an orange tip, that Eduardo claimed to have stolen from the car of a former school classmate and drug dealer named Sergio. Eduardo stole the BB gun about 10 months before his death. N.Z. saw the BB gun inside Eduardo's car only one time about five months before Eduardo passed and believed Eduardo gave the BB gun to a friend.

After hearing argument from counsel, the court excluded the proposed evidence regarding theft of the BB gun under Evidence Code Section 352 finding

24

its probative value was substantially outweighed by the probability its admission would create a substantial danger of undue prejudice, of confusing the issues in this case, and misleading the jury. Assuming the hearsay statement qualified as a statement against penal interest, the court concluded it lacked reliability.

B. *Analysis*

Appellants contend the trial court committed prejudicial error by excluding N.Z.'s testimony because Eduardo's statement to her regarding stealing the BB gun was admissible as a statement against his penal interest. They further assert this evidence supported the defense theory of the case and its exclusion prejudiced them.

Hearsay is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).) Evidence Code section 1230 is one such exception for a statement that, "when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." The rationale underlying the exception is that " 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is [1] unavailable, that [2] the declaration was against the declarant's penal interest when made and that [3] the declaration was

25

sufficiently reliable to warrant admission despite its hearsay character.' " (*Grimes*, *supra*, 1 Cal.5th at p. 711.) Nonetheless, Evidence Code section 1230 is also subject to Evidence Code section 352. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 (*Cudjo*).) A court's determination under Evidence Code section 352 is also reviewed for abuse of discretion. (*Cudjo*, at p. 609.)

For purposes of analysis, we will assume Eduardo's declaration to N.Z. qualified as statements against his penal interest.[7] The court, however, properly excluded the evidence under Evidence Code section 352. Eduardo's act of stealing a toy BB gun with an orange tip had no probative value to support Alvarado's claim Ruben had pointed a replica firearm at him that Alvarado believed was real. Admitting evidence of this theft would have distracted and confused the jurors because theft of a toy firearm at some unknown date in the past was dissimilar to the facts of the present case.

Even assuming the court erred in excluding Eduardo's statements to N.Z., the assumed error was harmless. Appellants had a meaningful opportunity to present a complete defense despite the exclusion of these statements. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 1019 ["a defendant has no constitutional right to present all relevant evidence in his favor," and "ordinary evidentiary rules do not impermissibly infringe on the defendant's right to present a defense"].) Ruben testified that Eduardo had a replica firearm that looked like a real handgun. He also agreed that airsoft guns look like a real firearms and a person could not tell it was fake without touching it.

---

7    Eduardo was unavailable and his statements to N.Z. were against his penal interest when made. Although the court concluded Eduardo's declaration as unreliable, "[e]xcept in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest." (*Cudjo*, *supra*, 6 Cal.4th at p. 609.)

Additionally, excluding this evidence did not deprive appellants of their ability to use Alvarado's statements during the undercover operation to argue Eduardo and Ruben tried to rob them.  Accordingly, any assumed error in excluding this evidence was harmless.

## DISPOSITION

The judgments are reversed.

HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


KELETY, J.

Filed 12/31/24

CERTIFIED FOR PUBLICATION[§§]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082237 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD288314) |
| v. | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| ANGEL GARCIA et al., | |
| Defendants and Appellants. | |

THE COURT:

The opinion in the above-entitled matter filed December 12, 2024, was not certified for publication. It appearing the opinion meets the standards for partial publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED IN PART.

IT IS HEREBY CERTIFIED that the opinion meets the standards for partial publication specified in California Rules of Court, rule 8.1105(c); and

---

[§§] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II.

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in part in the Official Reports.


HUFFMAN, Acting P. J.

Copies to:  All parties

2